FILED
United States Court of Appeals
Tenth Circuit

April 12, 2013

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

     Plaintiff-Appellee,

v.

DAVID GLEN SHUCK,

     Defendant-Appellant.

No. 12-5072

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA
(D.C. No. 4:11-CR-00166-CVE-1)**

---

Submitted on the briefs:

James Fatigante, Tulsa, Oklahoma, for Defendant-Appellant.

Danny C. Williams, Sr., United States Attorney, and Leena Alam, Assistant United States Attorney, Tulsa, Oklahoma, for Plaintiff-Appellee.

---

Before **BRISCOE,** Chief Judge, **ANDERSON** and **TYMKOVICH**, Circuit Judges.

---

**BRISCOE**, Chief Judge.

---

David Shuck was charged on November 7, 2011, with five counts: conspiracy to

manufacture 100 or more marijuana plants in violation of 21 U.S.C. §§ 846,

841(b)(1)(B)(vii); manufacture of 100 or more marijuana plants in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B)(vii); two counts of the use and maintenance of a place for the purpose of manufacturing marijuana in violation of 21 U.S.C. § 856(a)(1), (b); and possession of marijuana with intent to distribute in violation of 21 U.S.C. § 841(a)(1), (b)(1)(D). Shuck entered a conditional guilty plea on all five counts and was sentenced on April 12, 2012, to eighteen months. Shuck argues that the district court erred in denying his motion to suppress, and that the district erred in denying his motion for an additional downward departure in sentencing. We have jurisdiction to review these rulings pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742, respectively. We affirm the district court in all regards.[1]

## I

On July 27, 2011, Creek County Sheriff's Detective Leslie Ruhman received a call from Ralph Bengston to report that he believed there was a marijuana-growing operation in the house next door. R. Vol. 2, at 37-40. Approximately thirty minutes after he received the call, Detective Ruhman, along with Undersheriff Rick Ishmael and Detective Matt Greco, met with Bengston at his home. Id. at 40-41. Bengston told the officers that he and his relatives had noticed the smell of marijuana coming from the trailer house next door, which was located approximately fifty yards from Bengston's property. Id. at 41.

---

[1] After examining the brief and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. See Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is, therefore, submitted without oral argument.

Detective Ruhman was unable to smell the marijuana from Bengston's property because he was recovering from a case of pneumonia. Id. at 42. Bengston told the officers that he had seen David Shuck and Vince Watson at the residence. Id. at 54. Bengston also told the officers that he had seen a brown Toyota pickup driven by Shuck and a 2000 silver Infiniti SUV coming and going from the residence. Id. at 50. Bengston gave the officers the license plate number of the silver Infiniti. Id. at 50-51.

Detective Ruhman, Undersheriff Ishmael, and Detective Greco then drove to the residence next door. The officers walked to the front of the trailer house, located in the northeast corner of the yard. Id. at 43. A gated chainlink fence enclosed the front yard and part of a driveway where a boat was stored. Id. at 43-44. Detective Ruhman testified that the gate appeared to be locked and that it had not been used in a while because of the amount of dirt accumulated at the bottom of the gate. Id. at 43. The officers went around the chainlink fence to the west side of the trailer house where the back door was located. Detective Ruhman testified that it appeared persons entering the trailer entered through the back door. Id. The officers saw surveillance cameras above both the front and back doors of the house. Id. at 44. Detective Ruhman then knocked at the back door but received no response. Id. at 44, 48. The officers saw a PVC pipe a foot or two to the right of the back door, which Detective Ruhman described as "hard to miss." Id. at 47. Detective Greco got down on his knees to smell the end of the pipe and detected the odor of marijuana. Id. at 76. Detective Ruhman also noticed that several windows of the home were boarded up and that all of the windows were covered. Id. at 48. Based on the

3

way that the windows were covered, Detective Ruhman did not think that anyone was living at the residence.  Id. at 50.

After the officers returned to their office, Detective Ruhman called the Creek County Rural Water District and learned that the residence's water service was listed under David Shuck and that the residence was using 1,000 to 2,000 gallons of water a month.  Id. at 49.  Detective Ruhman thought that the water usage was particularly high, especially for a residence that appeared to be uninhabited.  Id.  Detective Ruhman also looked up the license plate number on the silver Infiniti and learned that the vehicle belonged to Christie Watson.  Id. at 51.  Detective Ruhman obtained a search warrant for the trailer house based on information the officers had gathered—including information from Bengston regarding marijuana odor and vehicles coming and going from the property, the marijuana odor that Detective Greco had noticed, the fact that the windows at the home were covered, the property's high water usage, and the surveillance cameras above the front and back doors.  Supp. R. Vol. I, at 16-18.  The officers discovered another address for Shuck in Sand Springs, Oklahoma, because the Sand Springs address was listed on Shuck's driver's license.

Pursuant to the search warrant, the officers searched the trailer house and found chemicals to grow plant materials, numerous marijuana plants ranging from a foot to nine feet tall, trash bags full of marijuana, high pressure lights, ballasts, and fans.  Id. at 58-59.  The officers then contacted Tulsa County deputies, who obtained consent to search the Sand Springs residence and discovered more marijuana there.  Id. at 111-12.

4

On November 7, 2011, Shuck and co-defendant Vincent Watson were indicted on five counts: conspiracy to manufacture 100 or more marijuana plants in violation of 21 U.S.C. §§ 846, 841(b)(1)(B)(vii); manufacture of 100 or more marijuana plants in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B)(vii); two counts of the use and maintenance of a place for the purpose of manufacturing marijuana in violation of 21 U.S.C. § 856(a)(1), (b); and possession of marijuana with intent to distribute in violation of 21 U.S.C. § 841(a)(1), (b)(1)(D). R. Vol. 1, at 10-14. On December 16, 2011, Shuck moved to suppress evidence seized at both properties. R. Vol. 3, at 10, 12-13. On January 9, 2012, the district court denied Shuck's motion to suppress. R. Vol. 1, at 48.

On April 13, 2012, Shuck conditionally pled guilty to all five counts. Id. at 57. After his guilty plea, Shuck assisted the government in its case against Vincent Watson and provided testimony at trial. R. Vol. 3, at 27-28. Given Shuck's substantial assistance in the government's prosecution of Vincent Watson, the government moved for a six-level downward departure in his offense level, pursuant to U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553(e). Id. at 26. Shuck responded to the government's motion for downward departure and requested an additional four-level reduction, arguing that he and his family are at risk of injury because of his assistance to the government. Id. at 31-32. The district court granted the government's motion for a six-level downward departure and denied Shuck's request for an additional four-level departure. R. Vol. 2, at 24. On April 12, 2012, the district court sentenced Shuck to eighteen months. Id. at 27.

## II

Shuck presents two issues to this court. First, Shuck argues that the district court erred in denying his motion to suppress. Second, Shuck argues that the district court erred in denying his request for additional downward departure.

### *Motion to Suppress*

In reviewing the denial of a motion to suppress, "'we view the evidence in the light most favorable to the government, accept the district court's findings of fact unless clearly erroneous, and review de novo the ultimate determination of reasonableness under the Fourth Amendment.'" United States v. Polly, 630 F.3d 991, 996 (10th Cir. 2011) (quoting United States v. Eckhart, 569 F.3d 1263, 1270 (10th Cir. 2009)).

Shuck contends that the officers violated his Fourth Amendment rights when they entered his backyard and conducted a search under the guise of doing a knock and talk. Aplt. Br. at 15. He argues that the officers unlawfully entered the trailer home property when they decided not to approach the front door but went directly into the backyard. Id. at 16. Shuck further argues that the officers conducted an illegal search when Detective Greco dropped to his hands and knees and smelled the PVC pipe. Id.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause . . . ." U.S. Const. amend. IV. "[A] 'knock and talk' is a consensual encounter and therefore does not contravene the Fourth Amendment, even absent reasonable suspicion." United States v.

6

Cruz-Mendez, 467 F.3d 1260, 1264 (10th Cir. 2006) (citing United States v. Spence, 397 F.3d 1280, 1283 (10th Cir. 2005)).  Shuck contends that the knock and talk here was unconstitutional because the officers conducted the knock and talk at the back door of the trailer home, without first knocking on the front door.  Aplt. Br. at 17.

Shuck argues that the officers unlawfully entered onto the curtilage of his property by going directly to the back door.  Curtilage, the land immediately surrounding and associated with the home, "is the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life.'"  Oliver v. United States, 466 U.S. 170, 180 (1984) (quoting Boyd v. United States, 116 U.S. 616, 630 (1886)).  As a result, curtilage "has been considered part of home itself for Fourth Amendment purposes," and "warrants the Fourth Amendment protections that attach to the home."  Id.

Even assuming the area traversed by the officers was within the curtilage, the officers would not have violated the Fourth Amendment by walking up to the back door and knocking, as they did here.  See, e.g., Florida v. Jardines, No. 11-564, 569 U.S. __, 2013 WL 1196577, at *4 (Mar. 26, 2013) (holding that "there is no doubt that the officers entered [the curtilage]" when they entered the front porch of the house).  The "portion of the curtilage" that is "the normal route of access for anyone visiting the premises" is only a "semi-private area" on which police may set foot if they "restrict their movements to places visitors could be expected to go (e.g., walkways, driveways, porches)."  1 Wayne R. LaFave et al., Search & Seizure § 2.3(f) (5th ed., 2012 update) (footnotes omitted). "[O]bservations made from such vantage points are not covered by the Fourth

7

Amendment." Id. In United States v. Hatfield, 333 F.3d 1189 (10th Cir. 2003), for example, two police officers parked on a suspect's driveway to investigate a tip that marijuana was being grown behind the house. One officer made contact with the suspect at his door, while the other officer waited on the driveway. Id. at 1190-91. While on the driveway, the officer saw small structures in the home's backyard, which he suspected could be used to house growing marijuana. Id. at 1191. Although the defendant argued that these observations were made within his curtilage, we nonetheless upheld the denial of the suppression motion, reasoning that the officer had a legitimate "knock and talk" purpose for being on the driveway, and the officer could permissibly make observations from that vantage point. Id. at 1194-95.

Here, the evidence showed that by approaching the back door as they did, the officers used the normal route of access, which would be used by anyone visiting this trailer. This is an area that police may approach even without reasonable suspicion if they have a "knock and talk" purpose, as these officers did. United States v. Cruz-Mendez, 467 F.3d 1260, 1264-65 (10th Cir. 2006); see also Estate of Smith v. Marasco, 318 F.3d 497, 519 (3d Cir. 2003) ("Officers are allowed to knock on a residence's door or otherwise approach the residence seeking to speak to the inhabitants just as any private citizen may."). "Thus, a police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.'" Jardines, 2013 WL , at *4 (quoting Kentucky v. King, 131 S. Ct. 1849, 1862 (2011)). See also United States v. McDowell, No. 11-3337, __ F.3d __ (10th Cir. 2013) (holding that

8

the officer did not violate the Fourth Amendment by traversing the driveway and front sidewalk while conducting a "knock and talk"). Accordingly, the officers did not violate the Fourth Amendment when they approached the trailer's back door with an intent to speak to its occupants regarding the reported odor of marijuana.[2]

We also conclude that Detective Greco did not violate Shuck's Fourth Amendment rights by smelling the PVC pipe. Shuck analogizes Detective Greco's smelling of the PVC pipe to a police dog sniff. See, e.g., City of Indianapolis v. Edmond, 531 U.S. 32, 40 (2000) ("The fact that officers walk a narcotics-detection dog around the exterior of each car at the . . . checkpoints does not transform the seizure into a search."); Illinois v. Caballes, 543 U.S. 405, 409 (2005) ("[T]he use of a well-trained narcotics-detection dog—one that 'does not expose noncontraband items that otherwise would remain hidden from public view'—during a lawful traffic stop, generally does not implicate legitimate privacy interests." (citation omitted)). Shuck argues that cases in which the Supreme

_____

[2] Our conclusion that the officers did not violate Shuck's Fourth Amendment rights by approaching the back door is consistent with findings of other circuits. See, e.g., United States v. Thomas, 430 F.3d 274, 280 (6th Cir. 2005) (finding no reasonable expectation of privacy when the back door "'was customarily used as the entrance to the house'"); United States v. Raines, 243 F.3d 419, 421 (8th Cir. 2001) ("[The officer] did not interfere with [the defendant's] privacy interest when he, in good faith, went unimpeded to the back of [the defendant's] home to contact the occupants of the residence."); United States v. Garcia, 997 F.2d 1273, 1279-80 (9th Cir. 1993) ("If the front and back of a residence are readily accessible from a public place . . . the Fourth Amendment is not implicated when officers go to the back door reasonably believing it is used as a principal entrance to the dwelling."); United States v. Daoust, 916 F.2d 757, 758 (1st Cir. 1990) ("[I]f [the front] door is inaccessible there is nothing unlawful or unreasonable about going to the back of the house to look for another door, all as part of a legitimate attempt to interview a person.").

9

Court upheld the use of dog sniffs are distinguishable from this case because "the searched items [in those cases] were already under law enforcement control." Aplt. Br. at 20. But as the Supreme Court explained in Caballes, the key distinction between lawful and unlawful searches under the Fourth Amendment is whether there is a "legitimate expectation that information about perfectly lawful activity will remain private." 543 U.S. at 410. The Supreme Court distinguished Caballes, in which the Court upheld the use of a narcotics-detection dog to sniff around the exterior of a vehicle, from Kyllo v. United States, 533 U.S. 27 (2001), in which the Court held that the use of a thermal-imaging device to detect the growth of marijuana in a home constituted an unlawful search, based on a legitimate expectation of privacy:

> Critical to [Kyllo] was the fact that the device was capable of detecting lawful activity—in that case, intimate details in a home, such as at what hour each night the lady of the house takes her daily sauna and bath. The legitimate expectation that information about perfectly lawful activity will remain private is categorically distinguishable from respondent's hopes or expectations concerning the nondetection of contraband in the trunk of his car. A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment.

543 U.S. at 409-10 (quotation and citation omitted). Similar to the facts of Caballes, Detective Greco's smell of the PVC pipe in this case could not uncover intimate details or private activity within the trailer home.

Shuck argues that the Supreme Court's decision in Florida v. Jardines would "shed

light upon Fourth Amendment analysis regarding dog sniffs." Aplt. Br. at 21. In

Jardines, the Supreme Court held that the use of narcotics-sniffing dogs on the front porch

of a home constitutes a search within the meaning of the Fourth Amendment. Jardines,

2013 WL 1196477, at *6. However, Jardines can be distinguished from this case because

the officers here did not use dogs or other devices to detect the marijuana odor. See id. at

*8 n.2 ("If officers can smell drugs coming from a house, they can use that information; a

human sniff is not a search, we can all agree.") (Kagan, J., concurring). Further, the

Supreme Court has explained that "the police cannot reasonably be expected to avert their

eyes from evidence of criminal activity that could have been observed by any member of

the public." California v. Greenwood, 486 U.S. 35, 41 (1988); see also California v.

Ciraolo, 476 U.S. 207, 213 (1986) ("That the area is within the curtilage does not itself

bar all police observation. The Fourth Amendment protection of the home has never been

extended to require law enforcement officers to shield their eyes when passing by a home

on public thoroughfares.").

Here, Shuck's exposure of the marijuana odor to the public defeated his

subsequent claim to Fourth Amendment protection. Bengston and his family members

could smell marijuana odor from their home next door. See United States v. Angelos,

433 F.3d 738, 747 (10th Cir. 2006) (explaining that the plain smell doctrine is a logical

extension of the plain view doctrine); 1 Search & Seizure § 2.2(a) (discussing "plain

smell" equivalent of the "plain view" rule). In addition, the PVC pipe was clearly

noticeable by anyone standing at the back door of the trailer house, which appeared to be

the door commonly used by anyone entering the trailer. Any observations that the officers made from the vantage point of the back door, including Detective Greco's smell of the PVC pipe, are not protected by the Fourth Amendment. Cf. Jardines, 2013 WL 1196577, at *5 ("There is no customary invitation" to introduce "a trained police dog to explore the area around the home in hopes of discovering incriminating evidence.").

Because we conclude that the officers did not violate Shuck's Fourth Amendment rights in searching the trailer home, we conclude that the search of the Sand Springs property was not the fruit of an illegal search. Accordingly, the district court did not err in denying Shuck's motion to suppress evidence.

*Sentencing*

"[We] may review a denial of a downward departure only if the denial is based on the sentencing court's interpretation of the Guidelines as depriving it of the legal authority to grant the departure." United States v. Fonseca, 473 F.3d 1109, 1112 (10th Cir. 2007). We have no jurisdiction "to review a district court's discretionary decision to deny a motion for downward departure on the ground that a defendant's circumstances do not warrant the departure." United States v. Sierra-Castillo, 405 F.3d 932, 936 (10th Cir. 2005). Here, Shuck does not argue that the district court concluded it did not have the authority to grant his request for downward departure, and our review of the record does not indicate that the district court concluded that it lacked such authority. Although we do not have jurisdiction to review the district court's denial of Shuck's request for downward departure, we nonetheless may consider the overall reasonableness of his

12

sentence.  See United States v. Bergman, 599 F.3d 1142, 1150 (10th Cir. 2010).

"Reasonableness review is a two-step process comprising a procedural and a substantive component."  United States v. Verdin-Garcia, 516 F.3d 884, 895 (10th Cir. 2008) (citing Gall v. United States, 552 U.S. 38, 51 (2007)).  The appellate court

> must first ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence — including an explanation for any deviation from the Guidelines range.

Gall, 552 U.S. at 51.  In reviewing the district court's sentence for procedural reasonableness, we review the district court's legal conclusions de novo and its factual findings for clear error.  Fonseca, 473 F.3d at 1112.  In reviewing the district court's sentence for substantive reasonableness, this court considers the sentence imposed under an abuse of discretion standard and will "take into account the totality of the circumstances, including the extent of any variance from the Guidelines range."  Gall, 552 U.S. at 51.

Here, the district court's sentence is both procedurally and substantively reasonable.  Shuck argues that the district court failed to consider § 5K1.1(a)(4), "any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance."  However, at the sentencing hearing, the district court considered Shuck's argument regarding the potential threat of retribution from co-defendant Vincent

13

Watson. Shuck argued to the district court that his property had been vandalized and that his employer had received a potentially threatening telephone call about Shuck's case. R. Vol. 2, at 18-20. In determining Shuck's sentence, the district court properly considered each of the § 3553(a) factors and found that "there are no factors present that separate [Shuck] from the mine run of similarly situated defendants in similar cases." Id. at 25. The district court also found that it "has granted a significant downward departure based on [Shuck's] substantial assistance to the government and finds no reason to grant an additional variance from the departure guideline range." Id. We conclude that the district court's sentence for Shuck was reasonable.

## III

For the foregoing reasons, we AFFIRM.