FILED
United States Court of Appeals
Tenth Circuit

April 12, 2013

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT
_____

UNITED STATES OF AMERICA,

     Plaintiff-Appellee,

v.

THEODORE McDOWELL, a/k/a
"Cush,"

     Defendant-Appellant.

No. 11-3337

_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF KANSAS
(D.C. No. 2:09-CR-20133-JWL-8)**
_____

Branden A. Bell, Bell Folsom, P.A., Olathe, Kansas, for Defendant-Appellant.

Leon Patton, Assistant United States Attorney (Barry R. Grissom, United States
Attorney, with him on the brief), Kansas City, Kansas, for Plaintiff-Appellee.
_____

Before **LUCERO**, **BALDOCK**, and **TYMKOVICH**, Circuit Judges.
_____

**BALDOCK**, Circuit Judge.
_____

A jury convicted Defendant Theodore McDowell of one count of conspiracy to

possess with intent to distribute more than 1,000 kilograms of marijuana, in violation of

21 U.S.C. § 841(a)(1) and (b)(1)(A)(vii).  Prior to trial, Defendant unsuccessfully sought

to suppress evidence seized in the house where he was arrested.  He now appeals the

denial of his motion to suppress as well as two sentencing issues.  Exercising jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742, we affirm.

I.

The facts relating to the larger marijuana trafficking conspiracy involved in this case are set forth more fully in United States v. Stephen Blackburn, --- F. App'x ---, No. 11-3294 (10th Cir. 2013) (unpublished).  The facts relevant to this appeal are as follows.  At around 11:00 p.m. on May 1, 2007, Avondale (Arizona) Police Officer Reginald Sayles was dispatched to a house on West Hubbell Street to attempt to locate a woman under investigation for assault in Surprise, Arizona.  He parked two houses down from the residence and approached on foot.  In order to reach the sidewalk leading to the front door, he had to cross the driveway.  As he walked diagonally across the driveway, he "smelled a strong odor of fresh or unburned marijuana" that appeared to come from the garage.  Record on Appeal ("ROA"), vol. II at 243.  At the front door, he "still smelled the odor of strong, unburned marijuana," although the odor was strongest in front of the garage.  Id.  He then stepped off the sidewalk and tried to look through the window beside the door but could see nothing through the closed blinds.

Officer Sayles called for backup, and the next officer to arrive also smelled "the overpowering odor of fresh marijuana" as he walked into the driveway.  Id. at 325.  Sayles's sergeant then arrived on the scene and also smelled marijuana.  The officers requested a canine.  Upon arrival, the dog alerted to the house and specifically to a vent above the garage.  A police detective, Detective Martin, arrived on the scene and conferred with the officers.  While Detective Martin returned to the police station and

prepared a search warrant application, officers kept an eye on the house from a distance. At around 4:00 a.m., a van left the garage of the house, and headed toward Officer Sayles's location with only its parking lights on. Officer Sayles stopped the van, which was driven by Curtis Pitter (who produced an identity under the false name Trevor Martin). When Pitter rolled down the van window, Sayles and another backup officer both smelled unburned marijuana. A search of the van yielded several garbage bags containing "Saran Wrap-type material that still had what appeared . . . to be the marijuana leaves still stuck to the wrapping," as well as axle grease, packing peanuts, and wood chips. ROA vol. II, at 252.

The officers on the scene telephoned the details of this stop to Detective Martin, and he added them to the search warrant affidavit. A commissioner issued the search warrant, and officers executed it on the morning of May 2. The officers found five men inside the house, including Defendant, Sheldon McIntosh, Samora McIntosh, Ibrahima Kane, and Dwight Rhone. Defendant had grease stains on his clothing. Officers also found a second vehicle in the garage that contained approximately 630 pounds of marijuana in thirty boxes. The marijuana was wrapped in plastic and grease. The inside of the house contained drug packing materials and $223,000 in cash hidden in a suitcase and a spare tire.

After Defendant's arrest, he was convicted in Arizona state court on drug charges. Later, a federal grand jury in the United States District Court for the District of Kansas indicted him and nineteen other people on a number of drug trafficking and money laundering charges. The superseding indictment charged Defendant with conspiracy to

possess with intent to distribute more than 1,000 kilograms of marijuana. Defendant and the other men arrested with him moved to suppress the evidence found in both the van and the house, but the district court denied their motions. When the case went to trial, the jury heard evidence linking Defendant and the Avondale house with a larger drug trafficking conspiracy headed by Curtis Pitter and involving Defendant's father, Gladstone McDowell. The evidence showed that the conspirators would regularly drive from Kansas City, Missouri, to Phoenix, Arizona, carrying cash. They would then purchase marijuana, package it so as to reduce the smell, and ship it by UPS ground to Kansas City and sometimes other destinations. They would then fly back to Kansas City and repeat the process. The jury convicted Defendant of the charged conspiracy. The district court then sentenced him to 97 months' imprisonment after reducing his sentence from 151 months to reflect the 54 months he had served in Arizona based on the same conduct. See U.S.S.G. § 5G1.3(b)(1).

Defendant now appeals, raising three arguments. First, he argues the evidence found at the Avondale house should have been suppressed because the police violated the house's curtilage. Second, he argues the district court erred in calculating his sentence because it erroneously determined the duration of his participation in the conspiracy. Third, he argues the district court, when imposing sentence, improperly calculated the quantity of marijuana trafficked during Defendant's participation.

II.

Defendant argues the officers searching the Avondale property violated the house's curtilage while gathering the facts that supported the search warrant, thereby

- 4 -

rendering the warrant invalid. The Fourth Amendment protects a house's curtilage, that is, the "area immediately surrounding the home." Oliver v. United States, 466 U.S. 170, 178 (1984). The Supreme Court has articulated four factors to determine whether an area is within the curtilage: (1) the proximity of the area to the house; (2) whether the area is included within an enclosure surrounding the home; (3) the nature of the use to which the area is put; and (4) the steps taken by the resident to protect the area from observation. United States v. Dunn, 480 U.S. 294, 301 (1987). The central inquiry is "whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." Id. We review the district court's legal rulings on a motion to suppress de novo, viewing the evidence in the light most favorable to the government, and we review the court's factual findings for clear error. United States v. Vazquez, 555 F.3d 923, 927 (10th Cir. 2009).

Defendant all but concedes the last three factors of United States v. Dunn do not support his argument, but says "[t]he first factor falls so heavily in Mr. McDowell's favor that it outweighs the latter three combined." Appellant's Br. at 18. He argues that when officers approach within very close proximity to a house, an area he dubs the home's "nimbus," they violate the home's curtilage.[1] While this case was pending, the Supreme Court decided Florida v. Jardines, --- S. Ct. --- 2013 WL 1196577 at *4 (2013), in which it held that a front porch falls within the curtilage because it "is the classic exemplar of an area adjacent to the home and 'to which the activity of home life extends.'" So the

_____

[1] Neither this circuit nor any other federal court has used the term "nimbus" in the Fourth Amendment context.

Court's holding lends some support to Defendant's argument that the area immediately in front of his home falls within the curtilage.

But even if Officer Sayles did invade the curtilage, this invasion did not render the warrant invalid. The Court in <u>Jardines</u> observed that "a police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.'" <u>Id.</u> (quoting <u>Kentucky v. King</u>, 131 S. Ct. 1849, 1862 (2011)). Likewise, our circuit has consistently held that "knock and talk" investigations do not "contravene the Fourth Amendment, even absent reasonable suspicion." <u>United States v. Cruz-Mendez</u>, 467 F.3d 1260, 1264 (10th Cir. 2006). <u>See also</u> <u>United States v. Hatfield</u>, 333 F.3d 1189, 1194 (10th Cir. 2003). As Professor LaFave puts it, "In expectation of privacy terms . . . it is not objectionable that an officer has come upon the land in the same way that any member of the public could be expected to do, as by taking the normal route of access along a walkway or driveway or onto a porch." 2 Wayne R. LaFave, <u>Criminal Procedure</u>, § 3(c) (3d ed. 2007). So, whether or not the driveway and front sidewalk were curtilage, Officer Sayles did not violate the Fourth Amendment by traversing them on his way to the front door. Thus, the smell of marijuana that reached him while he was in the driveway was not fruit of an unlawful search.

Defendant makes much of the fact that Officer Sayles stepped off the sidewalk into the yard when he tried to look through the front window.[2] But Officer Sayles'

---

[2] He claims the district court clearly erred when it "determined that Sayles didn't leave the walkway." In fact, the court made no such finding. The court simply did not discuss Sayles' deviation from the sidewalk, likely because it correctly considered the deviation to be irrelevant.

excursion off the sidewalk is irrelevant here because it did not lead to the discovery of any evidence included in the warrant application. So even if Sayles violated the Fourth Amendment by stepping off the sidewalk, his doing so did not render the search warrant invalid. The district court properly denied the motion to suppress.[3]

III.

We turn now to Defendant's first challenge to his sentence. The district court sentenced Defendant under U.S. Sentencing Guideline § 2D1.1(c)(3), which establishes a base offense level of 34 for possession with intent to distribute more than 3,000 kilograms but less than 10,000 kilograms of marijuana. The district court arrived at this marijuana amount based on its acceptance of the Presentence Report's calculations. The Presentence Report concluded Defendant was actively involved in the conspiracy from May 2006 until May 2007 and that the marijuana trafficked during that time was attributable to him as "relevant conduct" under Guideline § 1B1.3. Defendant objected to the Presentence Report, arguing no evidence showed he was involved in the conspiracy until his May 2007 arrest. The district court overruled this objection and adopted the

---

[3] In Jardines, the Supreme Court held that using a drug-sniffing dog on a homeowner's front porch was a search within the meaning of the Fourth Amendment. Jardines, 2013 WL 1196577 at *7 (2013). But Jardines does not affect the outcome here because Officer Sayles smelled marijuana in this case before officers even called out the drug dog. According to the Jardines concurrence, "If officers can smell drugs coming from a house, they can use that information; a human sniff is not a search, we can all agree." Id. at *8 n.2 (Kagan, J., concurring). The search warrant application also informed the magistrate that a vehicle carrying packaging material covered with bits of marijuana had left the attached garage. So the warrant was supported by probable cause apart from the dog sniff. See United States v. Sims, 428 F.3d 945, 954 (10th Cir. 2005) ("When a warrant is tainted by some unconstitutionally obtained information, we nonetheless uphold the warrant if there was probable cause absent that information.").

Presentence Report's conclusion that Defendant's involvement in the conspiracy began in May 2006. We review the district court's factual findings for clear error, United States v. Gantt, 679 F.3d 1240, 1246 (10th Cir. 2012), and the Government must prove drug quantity by a preponderance of the evidence. United States v. Foy, 641 F.3d 455, 469 (10th Cir. 2011).

The district court heard the following evidence regarding Defendant's participation in the conspiracy. First, Devon Thomas, a member of the conspiracy who was then in Florida, testified that "Cush" was one of the "guys who were there working for us" in Arizona. ROA, vol. 2 at 1418. He explained that "Cush" was Gladstone McDowell's son, and other testimony confirmed that Defendant was known as "Cush." Second, Southwest Airlines records showed that Defendant flew from Phoenix to Kansas City six times in 2006, five of those times in company with other members of the conspiracy. He made flights on May 24 (apparently alone, but followed six days later by Pitter and Michael Williams), June 27 (with Pitter, Rhone, and Williams), July 18 (with Rhone), October 18 (with Sheldon McIntosh and Rhone), November 2 (with Pitter, Sheldon McIntosh, Rhone, and Williams), and November 11 (with Pitter, Sheldon McIntosh, and Williams). Defendant also flew from Las Vegas, Nevada, to Kansas City six times with other conspirators, beginning in August 2006. Devon Thomas testified the conspirators would frequently fly through Las Vegas because "it's easier to take large quantities of money through Las Vegas because of gambling." ROA, vol. II at 1437–38. These flight patterns matched up with Devon Thomas's testimony that the conspirators were shipping marijuana from Phoenix to Kansas City every two weeks. The one-way

nature of the flights also corresponds with the testimony that the conspirators would drive or take a bus from Kansas City to Phoenix and then return by flying.

Defendant argues this evidence only shows his association with conspirators, which is not enough to prove participation in a conspiracy. See United States v. Wardell, 591 F.3d 1279, 1288 (10th Cir. 2009). But the evidence here showed more than mere association. By the time of his May 2007 arrest, Defendant was undisputedly participating in the conspiracy. The only question is when that participation began. Defendant's frequent one-way flights from Phoenix and Las Vegas in company with other conspirators support the reasonable inference that he was participating in the conspiracy. Based on this evidence, the district court did not clearly err in concluding by a preponderance of the evidence that Defendant joined the conspiracy in May 2006.

IV.

Defendant's second sentencing argument is closely related to his first. He argues the district court clearly erred in finding that the conspiracy trafficked more than 3,000 kilograms of marijuana during Defendant's participation from May 2006 to May 2007. The drug quantity determination "may be an approximation and the government's burden is only the preponderance of the evidence." United States v. Higgins, 282 F.3d 1261, 1280 (10th Cir. 2002). The Presentence Report attributed to Defendant 3,189 kilograms of marijuana based on the following calculations. Devon Thomas testified that the organization shipped 400 to 500 pounds twice a month from Arizona to Kansas City during 2006, but he did not testify regarding the amounts trafficked during the first part of 2007. The Probation Office assumed eight 400-pound shipments for the four months

from May through August of 2006, yielding 3,200 pounds. In the eight months from September 2006 to May 1, 2007, airline records showed sixteen flights by conspirators from Phoenix to Kansas City, or two flights per month. Although Devon Thomas's testimony suggests that each trip should be associated with 400 to 500 pounds at least through December 2006, the Probation Office only attributed 200 pounds to each trip, yielding another 3,200 pounds. On top of the 6,400 pounds it attributed to May 2006 through May 2007, the Probation Office added the 630 pounds sized in the Avondale stash house. This yielded 7,030 pounds, or 3,189 kilograms.

Defendant argues the Probation Office's assumption of 200 pounds per flight is created from thin air. We agree this number is somewhat puzzling. The only mention of 200-pound shipments is Devon Thomas's testimony that the organization shipped 200 to 300 pounds twice a month once it resumed trafficking marijuana in August 2007. But this was months after Defendant's arrest. Ultimately, the Probation Office's strange calculations are not important, because more straightforward arithmetic supported the district court's finding. Based on Devon Thomas's testimony, we know the organization shipped 400 to 500 pounds twice a month during 2006. If we conservatively assume 400-pound shipments twice a month from June through December 2006, we arrive at 5,600 pounds. Giving Defendant credit for one shipment in May 2006 brings us to 6,000 pounds.[4] Add in the 630 pounds seized at Defendant's arrest and we have 6,630 pounds or 3,007 kilograms. Of course, this is assuming the conspiracy trafficked *no* marijuana

_____

[4] The Probation Office attributed to Defendant two shipments in May 2006, but because his first recorded flight from Phoenix to Kansas City took place on May 24, we assume he was only involved in packaging one shipment in May 2006.

between January 1 and May 1, 2007, which hardly seems likely. This is especially true considering two or more members of the conspiracy flew from Las Vegas or Phoenix to Kansas City on January 24, February 13, March 9, March 27, and April 10, 2007. See ROA, vol. II at 2766–67. So even very conservative calculations supports the district court's finding.

Defendant argues this case is similar to United States v. Shonubi, 998 F.2d 84 (2d Cir. 1993). There, a U.S. Customs officer detained a man arriving at JFK International Airport from Nigeria on suspicion the man had swallowed packaged drugs. Id. at 86. The man eventually passed 103 balloons containing 427.4 grams of heroin. Id. At sentencing, the district court found the man had made eight trips to Nigeria in the fifteen months before he was apprehended. Id. at 87. The court therefore multiplied eight trips times 427.4 grams and concluded the defendant had imported a total of 3419.2 grams of heroin. Id. The Second Circuit concluded this was error because the calculation was necessarily speculative. Id. at 90. The court said the drug quantity calculation required "specific evidence" such as "drug records, admissions, or live testimony." Id. at 89.

This case is unlike Shonubi. The district court based its calculations on Devon Thomas's testimony regarding the amount of marijuana trafficked each month. The only period his testimony did not cover was January through May of 2007. The frequent flights during that time and the quantity of cash found in the Avondale house suggest the organization was still shipping large amounts of marijuana during those months. Even without attributing *any* marijuana to those months, the court could easily have reached a number over 3,000 kilograms. So the district court did not clearly err.

AFFIRMED.