FILED
United States Court of Appeals
Tenth Circuit

January 6, 2014

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

STEVEN KASEY DUPREE,

      Defendant - Appellant.

No. 13-2062
(D.C. No. 2:12-CR-01165-JBM-1)
(D. N.M.)

**ORDER AND JUDGMENT**[*]

Before **LUCERO**, **MURPHY** and **MATHESON**, Circuit Judges.

Steven Kasey Dupree pled guilty to a single-count indictment charging him with

conspiracy to transport illegal aliens in violation of 8 U.S.C. §§ 1324(a)(1)(A)(ii),

1324(a)(1)(B)(i), and 1324(a)(1)(A)(v)(I).  His conditional plea agreement permits him to

bring this appeal challenging the district court's order denying his motion to suppress

evidence.  Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

I. **BACKGROUND**

The facts below reflect the findings of the district court, which adopted findings by

---

[*]This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel.  It may be cited, however, for its
persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

a magistrate judge.  We accept these findings unless they are clearly erroneous.  *See*

*United States v. Taylor*, 592 F.3d 1104, 1108 (10th Cir. 2010).  "A finding of fact is

clearly erroneous if it is without factual support in the record or if, after reviewing all the

evidence, we are left with a definite and firm conviction that a mistake has been made."

*Plaza Speedway, Inc. v. United States*, 311 F.3d 1262, 1266 (10th Cir. 2002) (quotations

omitted).  Because we are reviewing the district court's denial of a motion to suppress,

we recite the facts "in the light most favorable to the government."  *United States v.*

*Polly*, 630 F.3d 991, 996 (10th Cir. 2011).

## A. *Factual Background*

On February 7, 2012, Deputy Mike Waldrop—a deputy sheriff in Luna County,

New Mexico—responded to a tip from his girlfriend, Marci Dworkin, notifying him that

(1) her friend Brooke Jacobson had recently been beaten by Mr. Dupree and might still be

in danger and (2) Mr. Dupree was harboring eight illegal immigrants at Ms. Jacobsen's

house, where he had been staying.

The magistrate judge did not make specific factual findings regarding when during

the day Deputy Waldrop received the tip.  *See* ROA, Vol. I at 148.  However, testimony

in the record indicates that Ms. Dworkin spoke with Deputy Waldrop about Ms. Jacobsen

twice that day:  once in the morning, and again around 3:30 in the afternoon.  *See id.* at

79, 91-95.[1]

Ms. Dworkin told Deputy Waldrop that she had found Ms. Jacobsen badly beaten in a car in Ms. Dworkin's driveway that morning, sometime around 6:30 or 7:00 a.m. According to the magistrate judge, Ms. Dworkin notified Deputy Waldrop that Ms. Jacobsen "feared that [Mr. Dupree] was going to kill her." *Id.* at 148. Ms. Dworkin also mentioned that Mr. Dupree had eight illegal immigrants staying at Ms. Jacobsen's house.

Although Ms. Dworkin was with Ms. Jacobsen early in the morning, Ms. Jacobsen dropped Ms. Dworkin off at work sometime before midday. While Ms. Jacobsen and Ms. Dworkin were in the car together, Mr. Dupree called Ms. Jacobsen, and Ms. Dworkin overheard him on the speakerphone asking Ms. Jacobsen, "Do you want me to kill you?" *Id.* at 96.

Ms. Dworkin testified that when she called Deputy Waldrop that afternoon, she was concerned that Ms. Jacobsen would return to her home where Mr. Dupree was staying. Ms. Dworkin urged Deputy Waldrop to go to Ms. Jacobsen's house to look for her, and she provided Deputy Waldrop with directions to the house.

Deputy Waldrop testified that he was concerned about Ms. Jacobsen's safety at the

---

[1] Ms. Dworkin testified that she spoke to Deputy Waldrop once in the morning, in person, and again on the phone in the afternoon. *See* ROA, Vol. I at 91-95. Deputy Waldrop's testimony, on the other hand, mentions only the afternoon phone call. *See id.* at 79. It seems clear, however, that Deputy Waldrop spoke with Ms. Dworkin at least once around 3:00-3:30 p.m.

-3-

time of the call and that he decided to go to the house out of concern for her welfare.[2]

Deputy Waldrop contacted his colleague Bobby Brookhouser, a detective, and together they went to the house. Although the magistrate judge did not make specific findings about when Deputy Waldrop and Detective Brookhouser got to the property, *see id.* at 148, Deputy Waldrop testified that they arrived sometime between 4:30 and 5:30 p.m., after a half-hour drive, *see id.* at 47, 76.

Deputy Waldrop and Detective Brookhouser drove onto the property through an open gate. According to the magistrate judge's findings, the officers initially knocked on the back door of the house, where no one answered.[3] They peered in the windows of the

---

[2] Deputy Waldrop also testified that he made unsuccessful attempts to contact Ms. Jacobsen by phone and to speak to another friend of Ms. Jacobsen's who could be aware of her whereabouts. The magistrate judge's findings of fact do not indicate the timing of Deputy Waldrop's phone calls to Ms. Jacobsen. *See* ROA, Vol. I at 149. Moreover, it is unclear from Deputy Waldrop's testimony whether his attempts to call her occurred before or after he went to the house to look for her. *Compare id.* at 61, *with id.* at 77-78.

[3] There are inconsistencies in the record and in the parties' briefs regarding which side of the house the officers approached first. *Compare* Aplt. Br. at 3 (indicating the officers initially knocked on the front door), *with* Aplee. Br. at 3 (indicating they knocked on the back door). Deputy Waldrop's testimony is also inconsistent. At one point during the suppression hearing, Deputy Waldrop referred to an exhibit as depicting the back door of the house; he later referred to the same exhibit as an image of the front door. *See* ROA, Vol. I at 46, 49, 50.

A review of the record indicates plausible reasons for genuine confusion. Photographs of the property demonstrate that both sides of the residence look remarkably similar. *Id.* at 161-63. The architecture of the home does not clearly indicate which side is the front and which is the back, and the yard around the house appears continuous and mostly barren, providing no clue as to which side of the house is the front. *Id.* at 163. Furthermore, Deputy Waldrop testified that the driveway to the house approaches the

Continued . . .

house and did not see anybody. Deputy Waldrop testified that the fact nobody answered heightened his concern for Ms. Jacobsen's safety: "She could have been unconscious in there. She could have been dead in there. We did not know at that time. That's why we were trying to make contact with her." *Id.* at 47.

While the officers stood outside the house, the door to a balcony on the second story of the house opened, and smoke started coming out of the door.[4] Deputy Waldrop testified that this fact heightened his concerns that Ms. Jacobsen "could have been in there, house burning, unconscious or dead." *Id.* at 49. Deputy Waldrop and Detective Brookhouser circled to the other side of the house—what the magistrate judge concluded was the front door—where they saw a man who told them that the front door would not open. Deputy Waldrop and Detective Brookhouser then went back around to the back door, where the man came outside.

Deputy Waldrop asked the man how many people were inside. The man responded there were three, including himself. At that point a second man came out of

_____

back door, suggesting that the side of the home facing the main road is not necessarily the typical means of access into the house. *See id.* at 49.

Given the parties' confusion, we rely on the finding of the magistrate judge that the officers approached the back door of the house first. We cannot conclude that this finding is clearly erroneous based on our review of the record. *See Plaza Speedway*, 311 F.3d at 1270 (10th Cir. 2002) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985)).

[4] It was later established that tortillas had caught fire while cooking on a stove on the second floor of the house, and this was the cause of the smoke. The fire was contained and limited to stove area.

the house. The two men yelled into the house for the third man to come out, but he did not.

Detective Brookhouser then entered the house to see who was there and conduct a protective sweep. He found a third man and brought him out of the house. Detective Brookhouser asked all three men if they had identification papers, and they stated they did not. The officers called United States Border Patrol, whose agents arrived and took the three undocumented men into their custody.

After leaving Ms. Jacobsen's residence, Deputy Waldrop made phone calls to Ms. Jacobsen inquiring about her whereabouts, though he was unable to reach her. The following day, Deputy Waldrop saw Ms. Jacobsen at a restaurant and verified that she was safe. He testified that he did not generate a police report about her beating because Ms. Jacobsen did not want to pursue the matter.

Mr. Dupree was arrested the day after Deputy Waldrop and Detective Brookhouser searched Ms. Jacobsen's residence. The presence of the three illegal aliens at Ms. Jacobsen's house formed the basis to prosecute Mr. Dupree.

B. *Procedural Background*

On May 16, 2012, a grand jury returned a one-count indictment against Mr. Dupree charging him with conspiracy to transport illegal aliens in violation of 8 U.S.C. §§ 1324(a)(1)(A)(ii), 1324(a)(1)(B)(i), and 1324(a)(1)(A)(v)(I).

On June 25, 2012, Mr. Dupree moved to suppress all evidence derived from the February 7 search, including the three undocumented men found at the house. Mr.

Dupree argued that the police officers had no search warrant and that neither probable cause nor exigent circumstances excused the warrantless search. At the ensuing hearing, Mr. Dupree contended more specifically that the officers impermissibly entered the curtilage of Ms. Jacobsen's property—the constitutionally protected "area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life." *Oliver v. United States*, 466 U.S. 170, 180 (1984) (quotations omitted). In response, the Government argued at the hearing that (1) Mr. Dupree did not have standing to suppress the identity of the undocumented immigrants because he himself was not unlawfully detained or arrested; and (2) the police legally entered the curtilage of Ms. Jacobsen's home due to exigent circumstances.

The matter was referred to a magistrate judge, who conducted an evidentiary hearing at which Deputy Waldrop and Ms. Dworkin testified.

On October 24, 2012, the magistrate judge issued her Proposed Findings and Recommended Disposition. The magistrate judge concluded that Mr. Dupree had standing to challenge the seizure of the undocumented immigrants because the Government had already conceded that Mr. Dupree had standing to contest the officers' search of the property, in which he, as a temporary resident, had a reasonable expectation of privacy. *See* ROA, Vol. I at 151-53. The magistrate judge decided, however, that Mr. Dupree's motion to suppress failed because (1) the officers did not impermissibly intrude upon the curtilage of the property before they entered the house and (2) their entry into the house itself was justified by exigent circumstances. *Id.* at 153-156.

Regarding the first issue, the magistrate judge concluded that the officers did not move into the curtilage of the property before entering the house. She relied on the four factors defining curtilage articulated by the Supreme Court in *United States v. Dunn*, 480 U.S. 294, 301 (1987).[5] In reaching this conclusion, the magistrate judge found credible Deputy Waldrop's testimony that the officers did not have to open any closed gates to drive up to the house. The magistrate judge also reasoned that the fence around the home did not restrict the public's view of the property, nor was there any indication that the area around the house was intended for any particularly private use "associated with the sanctity of a man's home and the privacies of life." *Oliver*, 466 U.S. at 180 (quotations omitted). Additionally, photographs provided at the suppression hearing indicated that the back yard of the house was not separated from the front yard of the house, and both sides of the house looked very similar. In light of these facts, the magistrate judge concluded that the police had not impermissibly strayed from "places visitors could be expected to go (e.g., walkways, driveways, porches)," *United States v. Hatfield*, 333 F.3d 1189, 1194 (10th Cir. 2003), and so their observations from outside the house were not covered by the Fourth Amendment, *id.*

Second, the magistrate judge concluded that the officers' entry into the home itself

---

[5] The four factors used to determine the scope of the area around the home to be considered curtilage are: (1) "the proximity of the area claimed to be curtilage to the home"; (2) "whether the area is included within an enclosure surrounding the home"; (3) "the nature of the uses to which the area is put"; and (4) "the steps taken by the resident to protect the area from observation by people passing by." *Dunn*, 480 U.S. at 301 (1987).

was justified by exigent circumstances. There was no violation of Mr. Dupree's constitutional rights when the two men came out of the house and voluntarily answered questions about their immigration status. Nor did Detective Brookhouser's entry into the house violate the Fourth Amendment because it was justified by an "objectively reasonable basis to believe there is an immediate need to protect the lives or safety of . . . others." *United States v. Najar*, 451 F.3d 710, 718 (10th Cir. 2006). The magistrate judge concluded that the officers had an objectively reasonable basis to believe there was an immediate need to protect Ms. Jacobsen because (1) there was smoke coming out of the second-story door, suggesting there may be a fire inside; (2) the two men who had come out of the house indicated that there was a third man inside,[6] and (3) Deputy Waldrop and Detective Brookhouser had reason to believe that Ms. Jacobsen may also have been inside the house based on the tip from Ms. Dworkin. The magistrate judge further determined that the protective sweep Detective Brookhouser conducted inside the house was reasonable and did not exceed the permissible bounds of a search justified by exigent circumstances.

Accordingly, the magistrate judge recommended that Mr. Dupree's motion to suppress be denied because (1) the officers had not entered onto the curtilage of the home when the two men came outside and (2) the entry into the home and discovery of the

---

[6] Although the magistrate judge did not specifically state this in her findings, *see* ROA, Vol. I at 156, it would have been reasonable for the officers to believe the third man inside might be Mr. Dupree, who according to Ms. Dworkin's tip was living with Ms. Jacobsen at the house at that time.

third man was justified by exigent circumstances.  ROA, Vol. I at 155-56.  Over Mr. Dupree's objections, the district court adopted the magistrate judge's recommendations—which it called "well-supported"—in full in an order dated November 8, 2012.  *Id.* at 171.

Mr. Dupree pled guilty on the condition that he would be allowed to appeal the district court's order denying his motion to suppress.  This appeal followed.

## II. **DISCUSSION**

Mr. Dupree contends the officers' warrantless entry onto the property, movement around the property, and search inside the home violated his Fourth Amendment rights.  Specifically, Mr. Dupree argues that by entering the fenced premises without a warrant, approaching the house, and knocking on doors from both sides, the police impermissibly invaded the curtilage of the home, thereby conducting an unconstitutional search.  *See generally Florida v. Jardines*, 133 S. Ct. 1409 (2013); *Oliver*, 466 U.S. 170.  Mr. Dupree also contends that the exigent circumstances exception did not justify the officers' entry into the house because some of the facts supporting the magistrate judge's finding of exigency—specifically, the smoke coming from the second-story door and the statement of the two men who opened the door—were not apparent to the officers until they had already impermissibly entered onto the curtilage.

Because we hold that exigent circumstances justified the officers' initial entry onto the property as well as the entire search, we need not decide whether their activities around the property occurred within the curtilage of the home. *See Harvey v. United States*, 685 F.3d 939, 950 n.5 (10th Cir. 2012) (we may "affirm on any ground adequately

supported by the record" (quotations omitted)).

## A. *Standard of Review*

As noted above, when reviewing a district court's denial of a motion to suppress, we view the evidence in the light most favorable to the Government and accept the district court's factual findings unless they are clearly erroneous. *See Polly*, 630 F.3d at 996. We "review *de novo* the ultimate determination of reasonableness under the Fourth Amendment." *Id.* (quoting *United States v. Eckhart*, 569 F.3d 1263, 1270 (10th Cir. 2009)).

"The existence of exigent circumstances is a mixed question of law and fact." *Najar*, 451 F.3d at 717 (quoting *United States v. Anderson*, 981 F.2d 1560, 1567 (10th Cir. 1992)). "Although we accept underlying fact findings unless they are clearly erroneous, the determination of whether those facts satisfy the legal test of exigency is subject to de novo review." *Anderson*, 981 F.2d at 1567 (quotations omitted).

## B. *Legal Framework*

"It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable" and therefore unconstitutional. *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (quotations omitted). The Fourth Amendment protection against "unreasonable searches and seizures," U.S. Const. amend. IV, extends to any areas in which "a person has a constitutionally protected reasonable expectation of privacy." *Oliver*, 466 U.S. at 177. The curtilage—"the land immediately surrounding and associated with the home"—is

-11-

protected as part of the home itself. *Id.* at 180; *see also Jardines*, 133 S. Ct. at 1414-15.

Searches of the curtilage or the home itself may be exempt from the warrant requirement if a "reasonable exception[]" applies. *Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011). Exigent circumstances are one such exception; a warrantless search is permissible if the "exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable." *Id.* (quotations omitted). Exigencies excusing the warrant requirement include the "emergency aid" exception, under which "officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Id.* (quoting *Brigham City*, 547 U.S. at 403).

Under this exception, officers may conduct a warrantless entry into a house when "(1) the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope of the search is reasonable." *Najar*, 451 F.3d at 718. The Government bears the burden of proving both elements of exigent circumstances. *Id.* at 717.

### C. *Analysis*

We hold that exigent circumstances justified Deputy Waldrop and Detective Brookhouser's initial entry onto the property and the search that followed. Our inquiry asks first whether the officers had an objectively reasonable basis to believe there was an immediate need to protect Ms. Jacobsen. Second, we ask whether the manner and the scope of the search was reasonable in response to the exigency. *See Najar*, 451 F.3d at

718.

As we explain more fully below, the nature of the exigency changed during the course of the officers' entry onto the property, and, as a result, the permissible manner and scope of the search changed as well. We therefore analyze the search in two stages: (1) the officers' activities outside the home and (2) their entry and subsequent search inside the home.

1. **Search outside the home**

a. *The officers' basis to believe there was an immediate need to protect lives*

Based on the magistrate judge's findings of fact and our review of the record, we conclude that at the time they arrived at the property, Deputy Waldrop and Detective Brookhouser had an "objectively reasonable basis to believe there was an immediate need to protect" Ms. Jacobsen, and this reasonable basis justified their entry onto the property. *Najar*, 451 F.3d at 718.

The Supreme Court has instructed that the emergency aid exception permits law enforcement officers to enter a home without a warrant "to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Brigham City*, 547 U.S. at 403. Both justifications apply here. Deputy Waldrop testified that he knew from Ms. Dworkin that Ms. Jacobsen was injured and in need of protection, having been badly beaten, allegedly at the hands of Mr. Dupree. Admittedly, Ms. Dworkin testified that she first notified Deputy Waldrop that Ms. Jacobsen was injured sometime that morning, and Deputy Waldrop did not go over to her house until later that afternoon,

-13-

suggesting that the need "to render emergency assistance" to the injured Ms. Jacobsen may have passed. *Id.* But the second type of exigency—the need "to protect [Ms. Jacobsen] from imminent injury," *id.*—was present at 4:30 p.m. Ms. Dworkin's and Deputy Waldrop's testimony agreed that Ms. Dworkin called Deputy Waldrop about Ms. Jacobsen around 3:30 p.m. Ms. Dworkin testified that she urged Deputy Waldrop to go over to Ms. Jacobsen's house to check on her because she was afraid that Ms. Jacobsen may have gone back to the house since that morning and that Mr. Dupree would be there. Ms. Dworkin also told Deputy Waldrop that Ms. Jacobsen was afraid that Mr. Dupree would kill her. In these circumstances, we agree with the magistrate judge that "the officers were entitled to go to [Ms. Jacobsen's] home to make sure she was all right." ROA, Vol. I at 156.

Ms. Dworkin's statement to Deputy Waldrop that Ms. Jacobsen was badly beaten was "credible evidence . . . of physical abuse" of the sort highlighting "the potential for violence" in a domestic dispute. *See Storey v. Taylor*, 696 F.3d 987, 995-96 (10th Cir. 2012) (discussing cases from other jurisdictions in which exigent circumstances justified entry into a home in response to a report of a domestic dispute). Ms. Dworkin was not an unknown informant; she was Deputy Waldrop's girlfriend. Deputy Waldrop testified that he believed her and was concerned about Ms. Jacobsen's safety at the time of the call. Deputy Waldrop also testified that his knowledge of Mr. Dupree heightened his concern for Ms. Jacobsen's welfare. Because Deputy Waldrop knew that Mr. Dupree had reportedly beaten and threatened Ms. Jacobsen that morning, he could reasonably

-14-

conclude that Mr. Dupree would do so again if she returned to the house. The officers'

initial entry onto the property was therefore justified to secure her safety.

Furthermore, the record indicates that Deputy Waldrop and Detective Brookhouser

arrived at the house as quickly as possible after receiving Ms. Dworkin's call around 3:30

p.m. Deputy Waldrop took directions from Ms. Dworkin to Ms. Jacobsen's house, met

up with Detective Brookhouser, drove for half an hour, and arrived at Ms. Jacobsen's

property around 4:30 p.m. The speed of Deputy Waldrop's response, coupled with his

testimony that he feared Ms. Jacobsen was in danger, indicates that he and Detective

Brookhouser acted in a manner that objectively reasonable officers would to "protect

[Ms. Jacobsen] from imminent injury." *Brigham City*, 547 U.S. at 403; *see also Ohio v.*

*Robinette*, 519 U.S. 33, 39 (1996) ("[T]he touchstone of the Fourth Amendment is

reasonableness." (quotations omitted)).

b. *Manner and scope of the search*

We further conclude that "the manner and scope of the search" the officers

conducted outside the house was reasonable and proportionate to the exigency at the

time. *See Najar*, 451 F.3d at 718. Acting on information that Ms. Jacobsen was

potentially in danger and inside the house, Deputy Waldrop and Detective Brookhouser

initially approached the house and knocked on a door. When they received no answer,

they had a reasonable basis to believe Ms. Jacobsen might be immobilized inside; at that

point, they went to the other side of the home. This limited search was an appropriate

attempt to find Ms. Jacobsen.

2. **Search inside the home**

a. *The officers' heightened basis to believe there was an immediate need to protect lives*

Mr. Dupree argues that exigent circumstances could not have justified the officers' entry into the home because two facts the magistrate judge relied upon in her exigency determination—the smoke coming out of the house and the statement of the two undocumented men that there was a third man inside the house—were not apparent to the officers until they had already invaded the curtilage of the home. We disagree for two reasons.

First, as explained above, the officers already had an exigency basis to search around the house to try to find Ms. Jacobsen. The officers therefore had not exceeded the scope of a permissible search when these additional facts came to their attention.

Second, both the smoke and the statement about the third man *heightened* the exigency after the officers arrived at the home. The smoke flowing from the second-story door in particular suggested the presence of a fire—a classic example of the sort of exigent circumstance that would justify a warrantless entry into a house. *See Najar*, 451 F.3d at 714 ("A warrant is not required to break down a door to enter a burning home to rescue occupants or extinguish a fire." (quoting *Wayne v. United States*, 318 F.2d 205, 212 (D.C. Cir. 1963)). The statement that a third man was inside likewise reinforced the officers' reasonable belief that Mr. Dupree might be present in the house. This information supplemented the ongoing threat to Ms. Jacobsen's safety, coupled with the

fact that Ms. Dworkin apparently could not locate her and strongly suspected she had returned to the house.

b. *Manner and scope of the search*

The manner and scope of Detective Brookhouser's search inside the home was reasonable in light of this heightened exigency. The magistrate judge found that once Detective Brookhouser entered the home, he "did not search the house, other than to look for people in the house, and did not open drawers." ROA, Vol. I at 156. We agree with the district court that under these circumstances, the manner and scope of the search was reasonable and lawful, and Mr. Dupree's motion to suppress was properly denied.

\*　　\*　　\*

Because we hold that exigent circumstances justified the officers' entry onto the property and the ensuing search was reasonable, we do not need to decide whether the officers came onto the curtilage of the property before entering the house itself.[7]

---

[7] Although we are not required to decide this issue, we note that Deputy Waldrop and Detective Brookhouser's initial search around the house likely did not impermissibly invade the curtilage. As we have already explained, photographs of the house indicate that it is unclear which side of the house is the back versus the front and what route marks the normal means of egress into the house. *See supra* note 3. As the magistrate judge noted, there was no indication that the yard was blocked off by a closed gate or that the area around the house, which was largely barren, was intended for "intimate activity associated with the sanctity of a man's home and the privacies of life." *Oliver*, 466 U.S. at 180 (quotations omitted).

Furthermore, law enforcement officers are permitted to enter onto part of the curtilage—"the normal route of access for anyone visiting the premises"—without first obtaining a warrant. *See United States v. Shuck*, 713 F.3d 563, 567 (10th Cir. 2013); *see also id.* (entry onto "walkways, driveways, porches" is allowed (quoting 1 Wayne R.

Continued . . .

### III. **CONCLUSION**

For the foregoing reasons, we conclude the district court did not err by denying

Mr. Dupree's motion to suppress. His conviction is therefore affirmed.

ENTERED FOR THE COURT


Scott M. Matheson, Jr.
Circuit Judge

---

LaFave et al., Search & Seizure § 2.3(f) (5th ed., 2012 update))). Detective Brookhouser approached the house from the side closest to the driveway first; they then went around and examined the other side of the house, after they observed the smoke that heightened the exigency. *See* ROA, Vol. I at 49, 148-49. In these circumstances, it seems that the officers limited their approach to "the normal route of access for anyone visiting the premises," or what appeared to be "places visitors could be expected to go." *Shuck*, 713 F.3d at 567.

Moreover, the observations that the officers made while outside the house—including seeing the smoke and looking in the windows—did not rise to the level of "searches" under the Fourth Amendment. *See id.* ("Observations made from such vantage points are not covered by the Fourth Amendment." (quotations omitted)); *see also Reeves v. Churchich*, 484 F.3d 1244, 1254-55 (10th Cir. 2007) (holding that officers standing in the front yard of a house were permitted to look inside windows); *cf. Jardines*, 133 S. Ct. at 1419 n.2 (Kagan, J., concurring) ("If officers can smell drugs coming from a house, they can use that information; a human sniff is not a search, we can all agree.").