FILED
United States Court of Appeals
Tenth Circuit

**February 9, 2010**

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

TYRONE PARKER,

      Defendant - Appellant.

No. 09-1229

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 08-cr-207-MSK)**

Howard Pincus, Assistant Federal Public Defender, (Raymond P. Moore, Federal Public Defender, with him on the briefs) Denver, Colorado, for Defendant-Appellant, Tyrone Parker.

James C. Murphy, Assistant United States Attorney, (David M. Gaouette, United States Attorney, with him on the brief) Denver, Colorado, for Plaintiff-Appellee, United States of America.

Before **TYMKOVICH, ALARCÓN**,[*] and **EBEL**, Circuit Judges.

**ALARCÓN**, Circuit Judge.

---

[*]Honorable Arthur L. Alarcón, Senior Circuit Judge, U.S. Court of Appeals for the Ninth Circuit, sitting by designation.

The sole issue raised in this appeal is whether the district court clearly erred in enhancing Tyrone Parker's sentence based on its finding that Parker had obstructed justice. He does not challenge the judgment of conviction or the denial of his motion to suppress the evidence the officers obtained after they entered his apartment after conversing with Parker in his doorway.

We affirm because we conclude that the district court did not clearly err in determining that Parker obstructed justice when he falsely testified at the suppression hearing that he did not consent to the entry of his apartment.

**I**

On February 19, 2008, officers of the Denver Police Department obtained warrants to search three residences in an apartment complex consisting of forty-three units. After executing the warrants, the officers decided to perform a "knock and talk"[1] with Parker at his residence in the same building. The officers did not have a warrant to search Parker's apartment. The officers knocked on Parker's door. After talking to Parker, the officers entered the apartment. In the apartment, the officers seized a Raven Arms .25 caliber handgun, a magazine, ammunition, as well as crack cocaine, and marijuana.

---

[1] This Court has characterized a "knock and talk" investigation as follows: "As commonly understood, a 'knock and talk' is a consensual encounter and therefore does not contravene the Fourth Amendment even absent reasonable suspicion." *United States v. De Jesus Cruz-Mendez*, 467 F.3d 1260, 1264 (10th Cir. 2006).

Parker was arrested and taken to the Denver Police Department Headquarters where he wrote out a statement indicating that he consented to the entry by the police officers into his apartment.

On May 6, 2008, a federal grand jury indicted Parker on two counts: Count 1 charged Parker with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1); and, Count 2 with knowingly possessing a firearm with an obliterated serial number, in violation of 18 U.S.C. § 922(k). Parker entered a plea of not guilty on May 13, 2008.

## II

### A

On July 21, 2008, Parker filed a motion to suppress the evidence seized in his apartment, as well as the statements he made there prior to his arrest. He argued in his motion that the evidence was obtained as a result of the warrantless entry into his apartment by Denver Police officers in violation of his rights under the Fourth Amendment because he did not freely consent to the search.

### B

The hearing on the motion to suppress was conducted on September 26, 2008. In his opening statement, Parker's counsel argued that the court should also suppress the written statement Parker executed at the police station because it was not voluntary and because it was the product of deceit and coercion.

Detectives Jeff N. Baran and James Reiva and Officers Anthony Schluck

and James Dixon of the Denver Police Department testified on behalf of the prosecution. Special Agent Mark J. Feltz of the Bureau of Alcohol, Tobacco and Firearms also testified for the prosecution. Tyrone Parker and his mother, Maebelle Parker, testified for the defense.

**1**

**a**

Detective Baran testified that a warrantless "knock and talk" investigation was conducted at Parker's apartment on February 19, 2008 with Detective Reiva and Officers Schluck and Dixon.

Detective Baran testified that after Detective Reiva knocked on the door, Parker opened it. He was holding a cell phone. Detective Reiva asked Parker: "Can we come in and talk to you?" Suppression Hr'g Transcript at 28, September 26, 2008.

Parker inquired whether the officers had a warrant. The officers responded that they did not have a warrant. Parker then stated: "Yeah, you can come in." *Id.* at 28-29.

As Detective Reiva stepped into the apartment, Parker stated: "I have a gun over there." *Id.* at 29. The firearm was in plain view from the doorway, once Parker stepped out of the way.

Detective Baran asked Parker if he had been convicted of any prior felonies. Parker replied: "Yes." *Id.* at 31. Detective Baran then advised Parker

of his *Miranda* rights. Parker stated that he understood his rights. Detective Baran asked if the firearm was loaded. Parker replied that it had six rounds in it – one in the chamber and five in the magazine. Parker stated that "on New Year's, I fired a couple of rounds into the air." *Id.* at 37.

Detective Baran asked Parker if he knew that as a felon, he could not legally possess a weapon. Parker replied: "Well, it's a risk I had to take, you know: either be safe and have the gun or get caught with it and go back." *Id.*

**b**

Detective Reiva testified that he participated in the "knock and talk" investigation at Parker's apartment. Detective Reiva knocked on Parker's door. It was a "regular knock." *Id.* at 57. Parker opened the door and Detective Reiva said "Denver Police." *Id.* Parker was holding a phone next to his ear. Detective Reiva stated to Parker: "Can we come in and talk to you for a minute?" *Id.* at 59. Parker said "yes" and stepped back and opened the door to make a path for the officers to enter. *Id.*

When Detective Reiva stepped into the apartment, he saw a chrome-plated handgun sitting on the top of the refrigerator. As Detective Reiva walked over to retrieve the firearm, Parker stated: "I have a gun over there." *Id.* at 62. In response to Detective Baran's question, Parker stated that he was a convicted felon. *Id.* at 63.

Detective Reiva saw crack cocaine residue on top of the refrigerator. He

also saw marijuana and crack cocaine residue in the sink.  Detective Reiva overheard Parker consent to a search of the apartment in response to Detective Baran's request.

**c**

After Parker was arrested and removed to Denver Police Headquarters, Detective Reiva read a *Miranda* advisement form to him.  Parker stated he understood his rights after they were read to him, and placed his initials after each statement.

Detective Reiva read the waiver provisions of the advisement to Parker. The form states: "Knowing my rights and knowing what I am doing, I now wish to voluntarily talk to you." Government's Response to Motion to Suppress at Ex. 1, August 8, 2008.  Parker wrote, "Yes" and signed his name after the waiver admonishment.  *Id.*  Detective Reiva then asked Parker to "write the story of what happened."  Suppression Hr'g Transcript at 73, September 26, 2008.  Parker's handwritten statement reads as follows:

> I Tyrone Edward Parker heard a knock at my door.  The officers then stated that this is the Denver Police Department, may we come in.  I agreed, they came into my apartment, I then told them that I have a gun, they retrieved the gun, and the box of ammo, did an apartment search found a little pot, and some crack that was found in my kitchen drain that I use for my personal consumption.

Government's Response to Motion to Suppress at Ex. 2, August 8, 2008.

At the bottom of this statement, Detective Reiva wrote out the following question in his own handwriting: "Did you put the marijuana and crack in the

drain?" *Id.* Parker wrote on the statement: "Yes because I got afraid when I heard the Police." *Id.*

Detective Reiva also wrote on the statement; "Where did you get the gun from?" *Id.* Parker responded in his own handwriting: "Someone I know name[d] Basket." *Id.* Each of Parker's statements were initialed by him. Parker signed the statement at the bottom of the page following the printed words: "*I have read the foregoing statement and the facts contained therein are true to the best of my knowledge and belief. I do not maintain that it contains all of the facts or details of the incident, but only those facts about which I have been asked.*" *Id.* (emphasis in the original).

## 2

### a

Parker testified in support of his suppression motion. He stated that he was talking to his mother on a cell phone at the time the police officers knocked on his door. He testified that he called her "[b]ecause I heard the police in my building and I wanted her to be on the phone with me." Suppression Hr'g Transcript at 87, September 26, 2008. Approximately five minutes before he called his mother he heard a crash, and someone shouted "Police, search warrant." *Id.* at 88. When he heard this, he put some marijuana and crack cocaine in the sink.

When he heard the knock on his door, he looked through the peek hole and

saw Detectives Baran and Reiva. One of the officers said: "Denver Police Department. Can we talk to you?" *Id.* at 89. Parker testified that he opened the door "[k]ind of like not all the way." *Id.* at 90. He held the door in his left hand and the cell phone in his right hand.

Detective Baran asked Parker: "Can we come in and talk to you?" *Id.* Parker replied: "Do you have a search warrant?" *Id.* Detective Baran said: "No." *Id.* Parker testified that he then stated: "No, you cannot come in here. I am on the phone with my mom in Chicago." *Id.* Parker then testified: "He reached in, told me to tell my mom goodbye, hung the phone up. I had on a hooded sweatshirt. He put the phone inside of [my] hooded sweatshirt and pushed me to the side and came in." *Id.* at 90-91. Parker then told the officers he had a gun sitting on top of the refrigerator because he was afraid that if they saw it they would shoot him.

Detective Baran asked him: "Do you know why we knocked on your door?" *Id.* at 92. Parker replied: "No." *Id.* Detective Baran then stated: "Because someone said that you were dealing drugs out of this apartment." *Id.* Detective Baran then put handcuffs on Parker and read him the *Miranda* rights.

Parker testified that he was read his rights and he agreed to speak to the officers. Parker testified that he executed a written statement at the police station after again being informed of his *Miranda* rights. Parker stated that he wrote the statement because "Detective Reiva told me to write down 'I, Tyrone Edward

Parker, agreed to them to come in.'" *Id.* at 95. Parker testified that he agreed to do so because Detective Reiva told him that if he did so the police would return the $750 they found in his apartment. Parker also testified that he was told that the statement could not be used against him in court.

**b**

Maebelle Parker testified that she had a phone conversation with her son on February 19, 2008. During this conversation, she heard someone knocking on the door. She heard Parker say: "Who is this?" *Id.* at 120. She heard a response that they were detectives or police officers.

Ms. Parker testified that her son asked if they had a search warrant. She heard someone say: "No." *Id.* Someone asked if they could come in. Her son said: "No." *Id.* She then heard someone ask if anyone else lived there. Her son said: "No." *Id.* at 121. Parker told someone, "I'm talking on the telephone with my mom." *Id.* The phone was then shut off.

On cross-examination, Ms. Parker stated that her son had written a letter to her while he was in jail in which he described what happened when the officers came to his apartment. She also testified that the phone went dead after someone said they did not have a warrant. When asked if she would "like to protect him from having to go to prison," Ms. Parker replied: "Oh, yes. I would like to protect any of my kids from having to do anything. I don't care what it is. I don't care if it's - - I don't know. Whatever." *Id.* at 126-7.

**3**

The Government called two Denver police officers during the suppression hearing to rebut the evidence produced by Parker's counsel. Denver Police Officer Schluck testified that he assisted Detectives Baran and Reiva in the "knock and talk" investigation of Parker on February 19, 2008. He stated that Parker responded: "Yes, come on in" when the detectives asked for permission to enter Parker's apartment. *Id.* at 138. Parker then backed away from the door to allow the officers to enter the apartment. Parker did not tell the officers they could not enter. No physical force was used to enter the apartment. Defense counsel did not cross-examine Officer Schluck.

Officer Dixon testified that he assisted in the "knock and talk" investigation at Parker's apartment. When the detectives asked for permission to enter his apartment, Parker replied: "Sure, come on in." *Id.* at 141. Parker then stepped back and opened the door. Parker did not tell the officers they could not enter. No physical force was used to enter Parker's residence. Defense counsel did not cross-examine Officer Dixon. *Id.* at 143.

Special Agent Feltz of the Bureau of Alcohol, Tobacco and Firearms testified that he participated in a telephone conference call interview of Ms. Parker by the prosecutor, Assistant U.S. Attorney Richard Hosley. She was asked several times to relate what she overheard on the telephone during her

conversation with her son on February 19, 2008. Ms. Parker stated that she heard someone knock on the door and announce that they were police officers. They asked Parker if they could speak to him. Her son asked if they had a warrant. Someone said: "No." *Id.* at 146. She stated she did not hear the officers ask if they could enter the apartment, nor did she hear her son respond. She did not state during the interview that her son denied the officers' request to enter his apartment.

C

After hearing counsels' arguments, the district court denied the motion to suppress the physical evidence seized from Parker's apartment and the statements he made during the search and at the police station. The district court stated:

> Here the defendant has denied that he gave consent to the officers to enter his apartment. The Court has found, having reviewed the conflicting evidence that, indeed, he did give consent. There is no issue as to the voluntariness of the consent because the defendant has simply denied that he gave it.

*Id.* at 158.

The district court held that Parker's statements were made freely and voluntarily after he waived his *Miranda* rights. In so ruling, the district court stated: "the Court finds that there was no constitutional violation either with regard to the entry into the apartment or with regard to the statement voluntarily made by the defendant." *Id.* at 160.

**III**

On December 22, 2008, Parker entered a guilty plea as to Count 1 of the indictment pursuant to a plea agreement. The Government moved to dismiss Count 2. The plea agreement provides that the parties dispute whether "Parker committed perjury when he testified, under oath, at the suppression hearing on September 26, 2008." Plea Agreement at 5, December 22, 2008. The parties agreed that "the Court may use the evidence presented at the September 26, 2008 suppression hearing to make factual determinations for sentencing purposes." *Id.*

The plea agreement further provides that "[t]he United States believes a two (2) level enhancement should be added, per § 3C1.1 because of the defendant's perjured testimony at the suppression hearing. *The defendant disputes the application of this enhancement.*" *Id.* at 6-7 (emphasis in original).

**IV**

The district court conducted the sentencing proceedings in this matter on May 19, 2009. After listening to counsels' arguments regarding whether the court should enhance Parker's sentence for obstruction of justice pursuant to U.S.S.G. § 3C1.1 based on his testimony at the suppression hearing, the court proceeded to hear Parker's allocution.

Parker explained why he opened the door when the police knocked on his door. He stated:

> And I was raised to respect the law. That's why I opened the door.
> If I did not respect the law, I wouldn't have opened the door. I
> wouldn't have never opened the door to talk to them. They came in
> on me. *So if I had disrespect for the law or disrespect for the public,*

*I would have told them, Hey, no, you can't come in here through the door, wouldn't have even opened the door face to face to even talk to them.*

Sentencing Hr'g Transcript at 41, May 19, 2009 (emphasis added).

The district court asked: "So do I understand correctly that you consented

to them entering the apartment?" *Id.* at 43. Parker replied:

> I did not. I did not. When I opened up the door, they said, "Is
> anyone in here?"
> I said, "No."
> They said, "Can I come in?"
> I said, "No, I'm on the phone with my mom in Chicago."
> They took the phone, hung it up, put it inside my coat, pushed me to
> the side.

*Id.*

In a subsequent passage, Parker also stated, in referring to the police

officers: "I know they're pillars of the community and maybe they remember

something different from me. I can't call - - I'm not going to say that they are

right and I am wrong, or whatever; but there is always two sides to a story." *Id.*

at 46.

After Parker had finished his allocution, the district court stated:

> The Court will now state the sentence it intends to impose. Counsel,
> you'll have a final chance to make arguments with regard to the
> sentence before judgment is actually entered. If after articulation of
> my reasoning you believe that the Court has erred or there is
> something in my reasoning that catches you by surprise and you
> would like an opportunity to research it and to make further
> argument with regard to it, you may request a continuance and I'll be
> happy to grant you a continuance.

*Id.* at 48.

In resolving the parties' dispute regarding whether it should adjust Parker's sentence because of obstruction of justice, the district court reasoned as follows:

> In order for this obstruction of justice enhancement to apply, the defendant must have made a false statement under oath concerning a material matter with the willful intent to provide such false testimony. The Court is required to specify the statement that was perjurious and to specifically find that there was willful intent to make the false statement.
>
> Before this hearing, I was prepared to deny this obstruction-of-justice enhancement because the mere fact that the Court believed the officers at the suppression hearing and disbelieved Mr. Parker did not mean that Mr. Parker's testimony was perjurious; in other words, that it was false and willfully false.
>
> There is often a belief on the part of Government that if the Court makes factual findings in the Government's favor that the Court is making a statement that, indeed, the defendant has testified falsely and that that constitutes perjury. One does not necessarily follow from the other.
>
> But here I have carefully listened to what Mr. Parker had to say during his allocution; and what Mr. Parker had to say during his allocution is absolutely inconsistent with what he's testified at the suppression hearing. He testified that the statements that he made in his written statements supplied to the police after his arrest were false. That's what he testified at the suppression hearing. And he testified that the police forced their way into his apartment, contrary to his written statement that he had consented to their entry.
>
> Now, ordinarily I would let that inconsistency stand; but he has effectively argued to this [C]ourt today that I should believe his written statement and that the parts of his written statement that I should believe are that he was cooperating with the police when they came to the door.
>
> When I asked him directly whether he consented to the entry or not, he then reverted back to the statement that he did not consent, which was inconsistent with his written statement and inconsistent with the statement that he made in the first part of the allocution.

- 14 -

My assessment of these statements is that he facilely moves from one statement to another, regardless of their consistency and regardless of their truth, solely to accomplish a particular objective of persuading the Court to a particular conclusion.

Realizing this to be the case, I conclude that his testimony at the suppression hearing that the officers forced their way into his apartment was false and it was made with the willful intent to mislead the court. As a consequence, I find that this enhancement for obstruction of justice is properly applied.

*Id.* at 54-55.

In referring to the inconsistency in Parker's allocution statement, the district court was apparently referring to the first part of the allocution. As quoted above, Parker stated he opened the door because of his respect for the law. He then stated "if I had disrespect for the law or disrespect for the public, I would have told them, Hey, no, you can't come in here through the door." *Id.* at 41. The district court appears to have construed this statement as an admission that he had consented to the entry out of his respect for the law. However, when the court asked Parker if he consented to the entry, Parker stated that he did not do so.

After the district court articulated its reasons for enhancing Parker's sentence for obstruction of justice, the prosecutor asked the district court to clarify whether "the Court is finding that that statement was also a material matter related to the suppression hearing at which the statement was made." *Id.* at 55-56. The district court replied: "Well, that was the focus of the suppression hearing." *Id.* at 56.

After pronouncing its sentence, the district court stated: "Is there need for clarification, further argument or a request for a continuance?" *Id.* at 68. Parker's counsel stated there was no need for a clarification of the sentence or a continuance. He did not object to the district court's consideration of the statements Parker made during his allocution in finding that Parker had testified falsely at the suppression hearing in denying that he consented to the search and that Detective Reiva instructed him to admit in his statement that he consented to the entry of his apartment.

Parker filed a timely notice of appeal on May 1, 2009. This Court has jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

**V**

In his opening brief, Parker summarized the sole issue on appeal as follows:

> THE DISTRICT COURT PLAINLY ERRED IN FINDING THAT MR. PARKER EVER SAID IN HIS ALLOCUTION THAT HE CONSENTED TO THE POLICE ENTRY, WHICH WAS THE ONLY REASON THE COURT DECIDED TO IMPOSE THE OBSTRUCTION ENHANCEMENT.

Appellant's Opening Br. at 22. Parker contends that the district court erred in concluding that his statements during allocution were inconsistent as to whether he consented to the police officers' entry into his apartment. He maintains that the district court "did not make the required perjury finding based on the hearing testimony itself." *Id.* at 14. The record does not support this contention.

- 16 -

This Court "review[s] the district court's factual findings as to the obstruction of justice under the clearly erroneous standard, and review[s] de novo the district court's legal interpretation of the Sentencing Guidelines." *United States v. Hawley*, 93 F.3d 682, 686-87 (10th Cir. 1996)*;* citing *United States v. Janus Industries*, 48 F.3d 1548, 1559-60 (10th Cir. 1995).

The district court denied the suppression motion because it found untruthful Parker's testimony: (1) that he did not consent to the search of his apartment; and, (2) that his handwritten statement to the contrary was dictated by Detective Reiva. "An appellate court may not decide the credibility of witnesses as that is the exclusive task of the fact trier." *United States v. Youngpeter*, 986 F.2d 349, 352 (10th Cir. 1993).

Sentencing Guidelines section 3C1.1 reads as follows:

If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (I) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by 2 levels.

U.S.S.G. § 3C1.1, cmt. 4(f) (Nov. 1, 2009) states that covered conduct includes "providing materially false information to a judge or magistrate."

In *United States v. Dunnigan*, 507 U.S. 87 (1993), the Supreme Court held that "the phrase 'impede or obstruct the administration of justice' includes perjury, and the commentary to § 3C1.1 is explicit in so providing." *Id.* at 92. The Court also instructed in *Dunnigan* that a witness commits perjury "if she

- 17 -

gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of faulty memory." *Id.* at 94.

After reconsidering Parker's testimony at the suppression hearing *and* his statements during the sentencing proceedings, the district court found that his testimony "that the officers forced their way into his apartment was false and it was made with the willful intent to mislead this court." The record supports this finding. The officers testified that Parker consented to the entry into his apartment, that he freely waived his *Miranda* rights, and freely and voluntarily wrote and signed a statement in which he stated that he had consented to the entry.

Parker did not offer any evidence that his testimony at the suppression hearing, and his statements during the sentencing proceeding, were the result of confusion, mistake, or faulty memory. After considering Parker's testimony *and* his statements during his allocution, the district court found that Parker had provided materially false information to the court in an attempt to seek suppression of the evidence obtained by the officers, and denial of the Government's request that his sentence be enhanced. Accordingly, we conclude that the district court did not err in finding that Parker obstructed justice at his suppression hearing.

The judgment is AFFIRMED.