EBEL, Circuit Judge.
In this direct criminal appeal, Defendant-Appellant Ralph Carloss contends that two police officers violated the Fourth Amendment by knocking on his front door, seeking to speak with him. Ordinarily a police officer, like any citizen, has an implied license to approach a home, knock on the front door, and ask to speak with the occupants. Carloss, however, claims that “No Trespassing” signs posted around the house and on the front door of his home revoked that implied license. We conclude, to the contrary, that under the circumstances presented here, those “No Trespassing” signs would hot have conveyed to an objective officer that he could not approach the house and knock on the front door seeking to have a consensual conversation with the occupants. Nor did the officers exceed the implied license to knock on the front door by knocking too long. We also uphold the district court’s factual finding that Carloss voluntarily consénted to the officers entering the house. Therefore, having jurisdiction under 28 U.S.C. § 1291, we AFFIRM the district court’s decision to deny Carloss’s motion to suppress evidence that the officers discovered as a result of their consensual interaction with Carloss, after he responded to their knocking.
BACKGROUND
Ashley Stephens, an agent with the federal Bureau of Alcohol, Tobacco and Firearms, received several tips that Carloss, a previously convicted felon, was unlawfully in possession of a firearm, possibly a machine gun, and was selling methamphetamine. In order to investigate these tips, Agent Stephens, along with Tahlequah, Oklahoma police investigator Elden Graves, went one afternoon to the home where Carloss was staying to talk with him. The home was a single-family dwelling located in a “pretty old area” in the “middle” of Tahlequah. (R. v.2 at 71-72.) There was no evidence of any fence or other enclosure around the house or yard, but there were several “No Trespassing” signs placed in the yard and on the front door. Specifically there was a “No Trespassing” sign on an approximately three-foot-high wooden post located beside the driveway, on the side farthest from the house, and another sign tacked to a tree in the side yard, both stating “Private Property No Trespassing.” (Aplt. Add. Def. Ex. 2-5, 7.) There was a sign, on a wooden pole in the front yard along the side of the driveway closest to the house, and a sign on the front door- of the house, both stating “Posted Private Property Hunting, Fishing, Trapping or Trespassing for Any Purpose Is Strictly Forbidden Violators Will Be Prosecuted.” (Id Ex. 1, 6.) These signs were professionally printed, with yellow or orange lettering against a black background. Although the officers testified that they did not recall seeing any of these signs, on the day they went to talk to Carloss, the district court found that the signs were there on that day, and that is not contested on appeal.
When the two officers went to the house to speak with Carloss, they drove into the driveway, parked, walked to the front door, and knocked “for several minutes.” (R. v.2 at 74.) In response to their knocks, the officers could hear movement, inside the house, but no one answered the front door. Instead, “a short time later,” Heather Wilson exited the back door of the house and met the officers in the side *991 yard. (Id. at 17.) The officers explained why they were there and asked who else was in the home. Wilson responded that Carloss, Earnest Dry, and Katy Homber-ger were inside.
At about that time, Carloss exited the back door of the house and joined the officers and Wilson in the side yard. At no time did either Wilson or 'Carloss point out the “No Trespassing” signs to the officers or ask the officers to leave. The officers told Carloss that they suspected he had a machine gun. Carloss responded that he could not be around “ammunition” because of his prior criminal conviction. (Id. at 18.) The officers then asked who lived in the house; Carloss responded that he had a room there, but Earnest Dry owned the house. (Earnest Dry’s mother, Diana Fishinghawk, was the actual owner.) When the officers asked Carloss if they could search the home, Carloss told them he would have to get “the man of the house,” referring to Dry. (Id.) As Carloss started to go inside, apparently to get Dry, the officers asked if they could go in with Carloss; he said, “sure.”[1] (Id. at 19.)
Carloss and the officers entered the back door, went through a storage or “mud” room into a room that Carloss identified as' his. (Id. at 34.) In Carloss’s room, the officers saw drug paraphernalia and a white powder residue that appeared to be methamphetamine.
The officers waited with Carloss in his room; Dry and Homberger soon entered. The officers identified themselves, explained to Dry why they were there and asked if they could search the house. Dry asked if they had a warrant; they did not. After calling his attorney, Dry declined to let the officers search the house and instead asked them to leave. They did so but, based on the drug paraphernalia the officers saw in Carloss’s room, they obtained a warrant to return and search, the house. During the search, pursuant to that warrant, officers found “multiple methamphetamine labs” and lab components, a loaded shotgun, two blasting caps, ammunition, and other drug paraphernalia. (R. v.3 (sealed) Doc. 80 ¶¶ 15-19.)
Based on this evidence, the United States prosecuted both Carloss and Dry for drug and weapons offenses. After unsuccessfully moving to suppress the evidence found in the house, Carloss pled guilty to conspiring to possess pseu-doephedrine; the district court sentenced him to forty-nine months in prison and three years’ supervised release. - His conditional guilty plea permitted this appeal to challenge the denial of his suppression motion.
. STANDARD OF REVIEW
In reviewing, the district court’s decision to deny Carloss’s suppression motion, “we view the evidence , in the light most favorable to the government, accept the district court’s findings of fact unless they are clearly erroneous, and review de novo the ultimate question of [the] reasonableness [of the officers’ actions] under the Fourth Amendment.” United States v. Pettit, 785. F.3d 1374, 1378-79 (10th Cir.2015), cert. denied, — U.S. -, 136 S.Ct. 282, 193 L.Ed.2d 205 (2015).
DISCUSSION
I. The officers did not violate the Fourth Amendment by going to the front door and knocking, seeking to speak with Carloss
The Fourth ’ Amendment provides that “[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches *992 and seizures, shall not be violated.” U.S. Const., amend. IV. “[H]ouses,” for Fourth Amendment purposes, include a home’s curtilage, and a home’s “front porch is the classic exemplar” of curtilage. Florida v. Jardines, — U.S. -, 133 S.Ct. 1409, 1415, 185 L.Ed.2d 495 (2013). Carloss contends that the search of his home pursuant to the warrant was illegal because the officers got the^warrant based on information that they obtained in violation of the Fourth Amendment when they trespassed onto the curtilage of his home — the front porch — to knock on the front door, seeking to speak with him.[2]
A. The Tenth Circuit has upheld an officer’s knocking on. the front door seeking to speak with a home’s occupants
This court has held, prior to Jardines, that police officers do not violate the Fourth Amendment by going to the front door of a home and knocking, seeking to speak with the occupants. Specifically addressing an investigative knock-and-talk— during which police officers knock on the door'of a home seeking to speak with the occupants, see United States v. Carter, 360 F.3d 1235, 1238 (10th Cir.2004) — this court has held that, “[a]s commonly understood, a ‘knock and talk’- is a consensual encounter and therefore does not contravene the Fourth Amendment, even absent reasonable suspicion.” United States v. Cruz-Mendez, 467 F.3d 1260, 1264 (10th Cir.2006); see also, e.g., United States v. Harrison, 639 F.3d 1273, 1276 n. 1 (10th Cir.2011); United States v. Parker, 594 F.3d 1243, 1244 n. 1 (10th Cir.2010); cf. Florida v. Royer, 460, U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality) (“[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions.”). See generally Kentucky v. King, 563 U.S. 452, 131 S.Ct. 1849, 1862, 179 L.Ed.2d 865 (2011) (“[Wjhen law enforcement officers who are not armed with a warrant knock on a door, they do no more than any citizen might do.”).
The home’s occupant remains free to terminate the conversation or even to avoid it altogether by not opening the door. See King, 131 S.Ct. at 1862 (“[W]hether the person who knocks on the door and requests the- opportunity to speak is a police officer or a private citizen, the occupant has no obligation to open the door or to speak.”).
B. Jardines did not change our prior law upholding knock-and-talks
The Supreme Court recently reaffirmed the validity of police knock-and-talk encounters in Jardines, 133 S.Ct. 1409. Jardines expressly recognizes that a police officer, like any member of the public, has an implied license to enter a home’s curti-lage to knock on the front door, seeking to speak with the home’s occupants. See id. at 1416.
1. Jardines did not involve a knock-and-talk
In Jardines, officers ■ approached the front door of a home, not seeking a consen *993 sual knock-and-talk, but instead specifically to conduct a search from the porch. The officers took a drug-sniffing dog onto Jardines’s front porch in order to gather information about what was occurring inside the home. Id. at 1413, 1416-18; cf. Kyllo v. United States, 533 U.S. 27, 29, 35 n. 2, 40, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001) (holding that an officer’s use of a thermal-imaging device from a public street to detect relative amounts of heat inside the home was a search). The Jar-dines Court .held that the license to approach a home and knock on the front door does not extend to permitting an officer to perform a search of. the interior of the house from the porch with the enhanced sensory ability of a trained dog. 133 S.Ct. at 1416 (stating that, for a home’s occupant “[t]o find a visitor knocking on., the dooi; is routine (even if sometimes unwelcome); to spot that same visitor exploring the front path with a metal detector, or marching his bloodhound into the garden before saying hello and asking permission, would inspire most of us to — well, call the police”); see also id. at 1416-17 & 1416 n. 4. In reaching that conclusion, however, Jar-dines reiterated that a knock-and-talk i1> self is not a search for Fourth Amendment purposes: “[I]t is not a Fourth Amendment search to approach the home in order to speak with the occupant, because all are invited to do that. The mere purpose of discovering information in the course of engaging in that permitted conduct does not cause it to violate the Fourth Amend-ttient.” Id. at 1416 n. 4 (citation, internal quotation marks omitted). The Jardines dissenters agreed with this part of the analysis.. Id. at 1423 (Alito, J., dissenting) (“[P]olice officers do not engage in a search when they approach the front door of a residence and seek to engage in what is termed, a ‘knock and talk,’ i.e., knocking on the door and seeking to speak to an occupant for the purpose of gathering evidence.”) (internal quotation marks omitted).. Thus, Jardines left our preexisting knock-and-talk precedent undisturbed.
2. In this case, the officers did not conduct a search when they went onto the front porch to knock on Car-loss’s front door
This case is distinguishable from Jar-dines because there is nothing in this record to suggest that the officers conducted, or intended to conduct, a search from the front porch when they went onto the front porch to knock on Carloss’s front door. See Jardines, 133 S.Ct. at 1414-16; see also United States v. Walker, 799 F.3d 1361, 1363-64 (11th Cir.2015). The officers did not.attempt to gather data about what, was occurring ins,ide the house from the. front porch, nor did they take with them anything that would enhance their ability to .do that, like the, drug-sniffing dog in Jardines or the thermal imaging device at issue in Kyllo. Here, the officers simply went to the front door and knocked, seeking to speak consensually with Car-loss. Nor did the officers discover any incriminating evidence while they were on the front porch knocking.[3].
*994 C. Post-Jardines cases make clear that Jardines . did not restrict knock-and-talks
Since Jardines, the Tenth Circuit'has continued to uphold the constitutionality of knock-and-talks, based on the implied’license recognized in Jardines that allows police officers, like members of the public, to approach the front door of a home and knock. See United States v. Shuck, 713 F.3d 563, 567 (10th Cir.2013) (“A ‘knock- and-talk’ is a consensual encounter” that “does not contravene the Fourth Amendment.”) (internal quotation marks omitted); see also McDowell, 713 F.3d at 574.[4]
D. There was an implied license here for members of the public to go onto the curtilage of Carloss’s home in order to knock on the front door
1. Jardines recognizes such an implied license
Jardines recognizes an implied license that “typically permits [a] visitor to approach [a] home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer), leave.” 133 S.Ct. at 1416. On this basis, “a police officer not armed with a warrant may approach a home and knock, precisely because that is ‘no more than any private citizen might do.’ ” Id. (quoting King, 131 S.Ct. at 1862).
Carloss contends that neither he nor Dry gave officers a license to approach the house and knock. But, because such “[a] license may be implied from the habits of the country,” id.- at 1415 (internal quotation marks omitted), a resident need not affirmatively grant the license. See generally James W. Ely, Jr. and Jon W. Bruce, The Law of Easements and Licenses in Land, § 11.2 (updated Sept. 2015) (“Licenses may ... be implied from the conduct of a landowner or from local custom.” (footnote omitted)).
2. The implied license at Carloss’s home had not been revoked
Carloss contends that the “No Trespassing” signs placed on and about the house where he lived revoked the implied license that the public has to approach the house and knock on the front door. Whether that is so depends on the context in which a member of the public, or an officer seeking to conduct a knock-ahd-talk, encountered the signs and the message that those signs would have conveyed to an objective officer, or member of the public, under the circumstances.[5] See State v. Christensen, No. W2014-00931-CCA-R3-CD, 2015 WL 2330185, at *8 (Tenn.Crim.App. May 14, 2015) (unpub *995 lished) (holding that “the. emerging rule appears to be that the implied invitation of the front door can be revoked but that the revocation must be obvious to the casual visitor who wishes only to contact the residents of a property”), appeal granted, (Tenn. Sept. 22, 2015); cf. State v. Hiebert, 156 Idaho, 637, 329 P.3d 1085, 1090 (App. 2014) (holding, in case involving police entering a combined business (junk yard) and residence, that, although the defendant’s father, who resided there, “testified that the back of the junk yard is closed to the public and that people are supposed to stop at the shop, the [relevant] question is what an ordinary visitor to the business property, not knowing the subjective intent of the owner, would have objectively perceived as reasonable conduct”). We conclude1 that, under the circumstances presented here, the “No Trespassing” signs placed about Carloss’s home would not have conveyed to an objective officer that he could not go to the front door and knock, seeking to speak consensually with Carloss.
As an initial matter, just the presence of a “No Trespassing” sign is not alone sufficient to convey to an objective officer, or member of the public, that he cannot go to the front door and knock. Such signs, by themselves, do not have the talismanic quality Carloss attributes to them. See Davis v. City of Milwaukee, No. 13-CV-982-JPS, 2015 WL 5010459, at *13 (E.D.Wis. Aug. 21, 2015) (indicating, post-Jardines, that “signs stating , ‘Private Property’ or ‘No Trespassing’ do not, by themselves, create an impenetrable privacy zone”); United States v. Jones, No. 4:13CR00011-003, 2013 WL 4678229, at *5 (W.D.Va. Aug. 30, 2013) (stating, gosl-Jar-dines, that “No Trespassing” “signs do not, in and of themselves, create a right to privacy or automatically place an area under the Fourth Amendment’s protections”); see also City of Beatrice v. Meints, 289 Neb. 558, 856 N.W.2d 410, 421 (2014) (holding, post-Jardines, that a resident “could not reasonably expect that tacking a ‘no trespassing’ sign to a tree would prevent others from viewing or walking on his land”), cert. denied, — U.S. -, 135 S.Ct. 2388, 192 L.Ed.2d 166 (2015); Christensen, 2015 WL 2330185, at *6-*8 (Tenn.Crim.App.). (rejecting, post-Jardines, a bright-line rule that a “No Trespassing” sign revokes the implied license to approach a front door to conduct knock-and-talk). Carloss has not cited, nor can we find, any post-Jardines authority holding that a resident can revoke the implied license to approach his home and knock on the front door simply by posting a “No Trespassing” sign.
Here, with the exception of the sign on the front door, the “No Trespassing” signs were placed in the unenclosed front and side yards and along the driveway of the house where Carloss lived. Because Carloss does not expressly claim that these areas were part of the home’s curtilage — and it was Carloss’s burden to establish what was included in the home’s curtilage, see United States v. Cavely, 318 F.3d 987, 994 (10th Cir.2003)—these areas were instead “open fields.” See Reeves v. Churchich, 484 F.3d 1244, 1255 (10th Cir.2007) (holding, where there was no evidence that a front yard was enclosed, used for intimate activities of the home, or in any way protected from observation, that front yard was not part of the home’s curtilage but was instead an open field); see also United States v. Cousins, 455 F.3d 1116, 1122-24 (10th Cir.2006) (holding side yard was not curtilage).
Those signs would not have conveyed to an objectivé officer, or member of the public, that he could not walk up to the porch and knock on the front door and attempt to contact the occupants. It is well-established that “No Trespassing” signs will not prevent an officer from entering privately owned “open fields.” See *996 Jardines, 133 S.Ct. at 1414; Oliver v. United States, 466 U.S. 170, 182-83, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984); see also Rieck v. Jensen, 651 F.3d 1188, 1189, 1191-94 (10th Cir.2011) (holding that a deputy sheriffs entry onto private property that was not curtilage, by opening a closed gate with a “No Trespassing” sign and despite homeowner telling deputy he had no right to enter, did'not violate the Fourth Amendment). That is true even though the officers’ entry into the yard might be considered a trespass at common law, see Oliver, 466 U.S. at 183-84, 104 S.Ct. 1735 (“[I]n the case of open fields, the general rights of property protected by the common law of trespass have little or no relevance to the applicability of the Fourth Amendment.”); Rieck, 651 F.3d at 1191 (10th Cir.) (stating that “the Supreme Court has made it clear that the Fourth Amendment does not track property law,” citing Oliver and United States v. Dunn, 480 U.S. 294, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987)); or might have violated Oklahoma statutory law, see United States v. Hatfield, 333 F.3d 1189, 1198-99 (10th Cir.2003) (holding officers did not violate the Fourth Amendment when they made observations from a defendant’s open field, even though the officers, in entering the open field, violated Okla, Stat. tit. 21, § 1835).[6]
There was also a sign on the front door itself stating: “Posted 'Private Property Hunting, Fishing, Trapping or Trespassing for Any Purpose Is Strictly Forbidden Violators Will Be Prosecuted.” (Aplt. Add. Def. Ex. 1.) But that sign was ambiguous and did not clearly; revoke the implied license extended to members of the public, including police officers, to enter the home’s curtilage and knock on the front, door, seeking to speak consensually with the occupants. The sign on the front door of Carloss’s home referenced activities that ordinarily do not take place within a home or its curtilage — hunting, fishing, and trapping. Thus, on its face, this sign does not appear to be directed to people who desire .to approach and speak directly with the occupants of the home in the ordinary course of societally accepted discourse. When considered in light of the other, similar “No Trespassing” signs in Carloss’s yard, this front door sign could have simply been reiterating that such recreational activities would not be *997 allowed on the property generally. See Christensen, 2015 WL 2330185, at *8 (Tenn.Crim.App.) (stating that a “sign reading ‘no trespassingt,] hunting[,] oh fishing,’ posted in a field next to appellant’s driveway ... would not have prevented the casual visitor or the reasonably respectful citizen from approaching appellant’s residence”; citing cases indicating that “such a sign, especially on a rural property, is generally intended to prevent people from unauthorized use of the property, not to prevent á casual visitor from approaching the residence”).' The message here does not clearly and unambiguously tell the mail carrier, pizza deliverer, or police officer that they cannot knock on the front’ door seeking a consensual conversation with those who live there. See Jones, 2013 WL 4678229, at *1-*2, *5-*6 (W.D.Va.) (holding, post-Jardines, that officers did not violate, the Fourth Amendment by entering rural property, driving past “No Trespassing” signs on either side of the driveway, passing another sign , on then- way to the house and another affixed to the house, and walking past a “No Trespassing” sign hanging to the right of the front door in order to conduct a knock-and-talk). We conclude that, under the' circumstances presented here, an objective officer would not have understood that the implied license he would ordinarily have to approach the porch and knock on the front door of a home had been revoked at this house. Therefore, the officers did not violate the Fourth Amendment when they went onto the porch and knocked on the front door of the house in which Carloss lived. See United States v. Bearden, 780 F.3d-887, 890-91, 893-94 (8th Cir.2015) (holding that officers did not violate the Fourth Amendment by driving through an open gate with a “No Trespassing” sign on their way to entering a home’s curtilage in order, to conduct a knock-and-talk); United States v. Lubrin, No. CR-2014-0056, 2015 WL 361796, at *2, *5-*6 & *5 n. 6, *6 n. 7 (D.Vi. Jan. 28, 2015) (holding that officers did not-violate the ■ Fourth Amendment by entering a home’s: curtilage through'a gate in a fence, to conduct knock-and-talk, despite a “No Trespassing” sign on the fence, but not near gate); Hiebert, 329 P.3d at 1089 n. 2, 1090 (Idaho Ct.App.) (holding that “No Trespassing” signs located in curtilage “cannot reasonably be interpreted to exclude normal, legitimate' inquiries or visits by ordinary individuals, including police officers, who restrict their movements' to the areas normally used by a reasonable visitor”); Pache v. State, 413 S.W.3d 509, 511-12 (Tex.App.2013) (holding the officers could enter curtilage and go to front door and knock, notwithstanding testimony'that there wds a “No.Trespassing” sign at the gate through which the officers entered front-yard); see also Covey v. Assessor of Ohio Comity, 777 F.3d 186, 190, 192-94 (4th Cir.2015) (suggesting that police officers'conducting knock-and-talk at a “privately' set home in [a] rural village” did not violate the Fourth Amendment by driving past two “No Trespassing” signs posted along driveway); Hollaran v. Duncan, 92 F.Supp.3d 774, 783-84, 787-88 (W.D.Tenn.2015) (holding that officers did not violate the Fourth Amendment by entering onto “farm property” by removing locked gate and driving past “No Trespassing” signs); United States v. Denim, No. 2:13-CR-63, 2013 WL 4591469, at *1-*6 (E.D.Tenn. Aug. 28, 2013) (holding, without discussing what areas of the home were curtilage, that placing six' “No Trespassing” signs along a driveway leading to a home did not revoke the implied license to approach home and knock, seeking to talk with occupants);
E. The officers did not exceed the scope of the implied license by knocking too long
.■ Carloss further argues that the officers exceeded the scope of their implied *998 license because they knocked at his front door too long. We cannot agree. The implied license Jardines recognized “typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave.” 133 S.Ct. at 1415. We decline to place a specific time limit on how long a person can knock before exceeding the scope of this implied license. Here, the officers testified that they knocked “for several” minutes or “a minute or two.” (R. v. 2 at 26, 74.) The officers were no doubt encouraged to remain a bit longer, ■ hoping someone would respond to their knock, because they heard movement inside the house and received no request from inside the house to depart. In fact, Heather Wilson emerged from the back door of the house only “a short while later,” or “a minute or so later,” and met the officers in the side yard. (Id. at 17, 63.) There is no suggestion that the officers knocked aggressively or demanded entry. Under these circumstances, we cannot say that the officers exceeded the implied license they had to approach the house and knock, seeking to speak with the occupants.
II. The district court did not clearly err in finding that Carloss voluntarily consented to the officers accompanying him into the home
Finally, the district court did not clearly err in finding that Carloss voluntarily consented to the officers following him into the house. See United States v. Thompson, 524 F.3d 1126, 1133 (10th Cir.2008) (holding “[v]oluntariness is a factual finding” reviewed for clear error); see also Jones, 701 F.3d at 1318 (10th Cir.) (setting forth factors to consider in deciding whether consent was voluntary); United States v. Benard, 680 F.3d 1206, 1211 (10th Cir.2012) (same).
Carloss first argues that his consent was the product of a Fourth Amendment violation — the officers’ unlicensed knocking on the front door. But we have concluded there was no such Fourth Amendment violation.
Carloss further asserts that his consent that the officers enter the house was involuntary because there was testimony suggesting that the officers conveyed to him, before he consented, that they would not let him enter the home without them; and that, because Carloss told the officers he could not consent to the search of the house, the officers should ■ not have believed that Carloss could consent to their accompanying them into the home. However, the district court found that Carloss voluntarily consented to the officers accompanying him into the house, and that finding was not clearly erroneous.
There were only two officers, dressed in plainclothes: They never ’drew their weapons. There was no evidence that the officers physically touched or mistreated Car-loss, nor that they got Carloss to let them enter the house using threats or promises. The officers spoke in a casual, rather than an aggressive, manner, never demanding entry into the house or otherwise claiming any lawful authority to be admitted. They did not retain any of Carloss’s personal effects and there is no suggestion that Carloss had any physical or mental deficits that the officers exploited. Carloss’s conversation with the officers occurred in the side yard, in public view during daylight hours. See Benard, 680 F.3d at 1211 (considering, in determining whether consent was voluntary, fact that interaction between officer and individual occurred in public place during daylight). Furthermore, although the officers did not inform Carloss that he could refuse their request to accompany him into the house (which is not a prerequisite for voluntary consent, see Schneckloth v. Bustamonte, 412 U.S. 218, 231-33, 93 S.Ct. 2041, 36 L.Ed.2d 854 *999 (1973)), Carloss was aware he could refuse the officers’ request because he had just declined to give them broader general consent to search the house, indicating instead that the officers would have to ask Dry for permission to do that. For these reasons, the district court’s finding-that Carloss voluntarily consented to the officers accompanying him into the house was not clearly erroneous.
CONCLUSION
For the foregoing reasons, we AFFIRM the district court’s decision to deny Car-loss’s suppression motion.

. At the suppression hearing, Carloss gave a different version of these events, but the district court found that the officers’ testimony was more credible, than Carloss’s.- On appeal, Carloss does not challenge that credibility determination.

. The Fourth Amendment protects against the government’s ' 1) unprivileged trespass on property expressly protected by the Fourth Amendment — "persons, houses, papers, and effects” — for the purpose of conducting a search or seizure; and 2) infringement of an individual’s reasonable expectation of privacy. See Jardines, 133 S.Ct. at 1414, 1417; see also United States v. Jones, — U.S. -, 132 S.Ct. 945, 949-53, 181 L.Ed.2d 911 (2012). Carloss expressly bases his argument solely on the trespass theory of Fourth Amendment protections and we, therefore, confine our analysis to that theory.

. Had the officers discovered incriminating evidence while lawfully on the front porch knocking, however, that would not violate the Fourth Amendment. See United States v. McDowell, 713 F.3d 571, 574 (10th Cir.2013). In McDowell, a post-Jardines case, an officer, at 11:00 p.m., walked on the driveway and front walk of a home, on his way to the front door to conduct a knock-arid-talk. Id. at 572. On his way to the front door, the officer smelled a strong odor of marijuana coming from the garage. Id. This court held that, "whether or not the driveway and front sidewalk were curtilage, [the officer] did not violate the Fourth Amendment by traversing them on his way to the front door. Thus, the smell of marijuana that reached him while he *994 was in the driveway was not fruit of an unlawful search,”

. The Fourth and Eleventh Circuits have also upheld knock-and-talks after Jardines. See Walker, 799 F.3d at 1363 (11th Cir.); Covey v. Assessor of Ohio Cnty., 777 F.3d 186, 192-93 (4th Cir.2015). There does not appear to be any circuit that has concluded, after Jardines, that a knock-and-talk is invalid.

. In this case, the property owner, Diana Fishinghawk, testified that her daughter put up the "No Trespassing” signs at the home in which Carloss lived seven years earlier, when the daughter lived in the house, because she was having trouble with “drunks” from a nearby bar wandering onto the property (R. v.2 at 103); Fishinghawk advised her daughter that the "No Trespassing” signs would assist the police in removing the drunks from the property. According to Fishinghawk, the "No Trespassing” signs were not intended to keep police officers from investigating crimes or providing assistance. Nevertheless, the relevant inquiry here, in determining whether the signs revoked the officers' implied license to approach the house and knock, has to be measured, not by what the resident subjectively intended, but instead by what an objective officer would have perceived.

. See generally Virginia v. Moore, 553 U.S. 164, 166, 176, 178, 128 S.Ct. 1598, 170 L.Ed.2d 559 (2008) (holding that an arrest was reasonable under the Fourth Amendment even though it violated state law, and stating that "linking Fourth Amendment protections to state law would cause them to vary from place to place and from time to time” (internal quotation marks omitted)); California v. Greenwood, 486 U.S. 35, 43, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988) ("We have never intimated ... that whether or not a search is reasonable within the meaning of the Fourth Amendihent depends on the law of the particular State in which the search occurs. Wfe have -emphasized instead that the Fourth Amendment analysis must turn on factors such as our societal understanding that certain areas deserve the most scrupulous protection from government invasion,” (internal quotation-marks omitted)); United States v. Jones, 701 F.3d 1300, 1309-10 (10th Cir.2012) (stating that, under facts presented there, the question of whether Missouri' officers were acting without authority under Kansas state law was "irrelevant” to the question of whether they violated the Fourth Amendment, that "officers’ violation of state law is not, without more, necessarily a federal constitutional violation,” and that, “[w]hile compliance with state law may be relevant to our Fourth Amendment reasonableness analysis in some circumstances, we have never held it to be determinative of the constitutionality of police conduct” (internal quotation marks omitted)); United States v. Madden, 682 F.3d 920, 927 (10th Cir.2012) ("Whether an arrest, search, or seizure may have violated state law is irrelevant as long as the standards developed under the Federal Constitution were not offended.” (internal quotation marks omitted)).